IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA

UNITED STATES OF AMERICA, )
Plaintiff, )
VS. ) 19-CR-81
CARL STUBER, IV, )
Defendant. )

APPEARANCES:

ATTORNEYS KYNDRA LUNDQUIST AND MATTHEW COLE, U.S. Attorney's Office, 111 Seventh Avenue S.E., Box 1, Cedar Rapids, Iowa 52401, appeared on behalf of the United States.

ATTORNEYS ERIC D. TINDAL AND ANDREA D. MASON, Keegan, Tindal, and Mason, 2322 E. Kimberly Road, Suite 140S, Davenport, Iowa 52807, appeared on behalf of the Defendant.

SENTENCING HEARING,

HELD BEFORE THE HON. C.J. WILLIAMS,

on the 4th day of May, 2020, at 111 Seventh Avenue S.E., Cedar Rapids, Iowa, commencing at 8:32 a.m., and reported by Patrice A. Murray, Certified Shorthand Reporter, using machine shorthand.

Transcript Ordered: 5/12/20
Transcript Completed: 6/5/20

Patrice A. Murray, CSR, RPR, RMR, FCRR
United States District Court
111 Seventh Avenue S.E.
Cedar Rapids, Iowa 52401-2101
(319) 286-2338

**INDEX**


**John Matias** **Page**

Ms. Lundquist ---- Direct -------------------- 9

Mr. Tindal ------- Cross --------------------- 23


**GOVERNMENT EXHIBITS**


Exhibits 1 through 10 ---------------------------- 11


**DEFENSE EXHIBITS**


Exhibit A ---------------------------------------- 12

(The following proceedings were held in open court.)

THE COURT: All right. The matter now before the Court is United States of America versus Carl William Stuber, Criminal Case Number 19-CR-81. This matter comes on for a sentencing hearing. The United States is represented by Assistant United States Attorneys Kyndra Lundquist and Matt Cole. The defendant is personally present and represented by Attorneys Andrea Mason and Eric Tindal. We also have participating by telephone United States Probation Officer Nathan VanderMolen, who is the author of the presentence investigation report filed at document number 32 in the court's file.

On November 12, 2019, the defendant pled guilty to two counts of a four-count superseding indictment. He pled guilty to Counts 2 and 3, each of which charged the same offense; that is, transmitting a threatening communication in Interstate Commerce in violation of Title 18 United States Code Sections -- or Section 875(c).

That crime is punishable by the following statutory penalties. Both counts -- or each count is punishable by up to 5 years in prison without the possibility of parole for a total of 10 years' maximum sentence. After the defendant has served his prison sentence, the Court can place him on a term of supervised release for up to 3

years. Probation is an option; and were the Court to impose probation, it would be for a term of 1 to 5 years. The Court can impose a fine of up to $250,000 on each count, for a total of $500,000. And the Court must impose a mandatory special assessment of $100 on each count for a total of $200.

Ms. Lundquist, on behalf of the United States, have you had a full and fair opportunity to review the presentence investigation report in this case?

MS. LUNDQUIST: Yes, Your Honor.

THE COURT: It's my understanding the government has a couple of objections to the guidelines here at paragraph -- it's the -- the objection is noted at paragraph 43, but essentially, as I understand, the government believes an enhancement should be applied under 2A6.1(b)(1) and also under 2A6.1(b)(3), for violating the Court order in the second instance. Are those all the objections the government has to the calculation of the advisory guidelines or anything else in this report?

MS. LUNDQUIST: Those were our objections, Your Honor. It is my understanding that just this morning we have reached an agreement. The parties have reached an agreement on the sentencing guidelines.

THE COURT: All right. I'm willing to hear it.

MS. LUNDQUIST: Okay. Under the parties' agreement, the government will withdraw the objection concerning 2A6.1(b)(1) and 2A6.1(b)(3), the objections for conduct evidencing an intent to carry out a threat in violation of a court protection order. And defendant will withdraw his objection to the enhancement in 2A6.1(b)(4) for substantial disruption of functions or services.

Essentially, we would agree to the guideline range as scored by the probation office; and then both parties would argue for their respective departures and variances.

THE COURT: All right. All right. Very good. Thank You, Ms. Lundquist.

Mr. Tindal, are you taking the lead on this trial -- or this case?

MR. TINDAL: I am, Your Honor.

THE COURT: Very good. You heard Ms. Lundquist recite the parties' agreement. Is that the parties' agreement in this case?

MR. TINDAL: That's accurate, Your Honor.

THE COURT: All right. Then does the defendant have any other objections to the advisory guideline range? I know that there's an objection to paragraph 96, which is a special condition of supervised release. Is

the defendant maintaining that objection? It has to do with a no-contact order with a couple of the alleged victims.

MR. TINDAL: Yes, Your Honor. I'm not sure it's so much of an objection as specifically with the fact there needs to be -- it's our position there needs to be some consideration for the bank continuing to act as trustee and him having a right to communicate with his trustee about trust matters. So we would continue with that. I guess it's really a request for a modification rather than an outright objection. That would be the only ongoing objection we would maintain to the no-contact order.

THE COURT: All right. We will take that up at the appropriate time. The government has also filed at document number 42 a bill of costs. Is the defendant contesting the bill of costs or the amount of money the government has asserted in that bill of costs?

MR. TINDAL: No, Your Honor.

THE COURT: Very good. All right. Could you make a brief record, Mr. Tindal, of how you went through this report with your client?

MR. TINDAL: Your Honor, when we received the draft presentence investigation report, a copy of it was sent to him in the jail, along with correspondence

indicating the need to not share or speak about the PSI with anyone. So he had an advanced copy of it. We subsequently met with him in the Linn County Jail and sat with him for approximately an hour going through the PSI individually, paragraph by paragraph or page by page. And from there, crafted objections to the presentence investigation report.

We have since seen him at least twice since that time. And he's had an opportunity to discuss other matters concerning the PSI and sentencing with us. But that's generally how we went through the PSI with him.

THE COURT: Thank you, Mr. Tindal.

Mr. Stuber, I see from the PSR that you've got a GED and it appears that you've -- do you have the ability to read this PSR on your own, sir?

THE DEFENDANT: Yes, Your Honor.

THE COURT: All right. Very good. Do you feel like you've had sufficient time to get through this PSR with your attorneys?

THE DEFENDANT: Yes, Your Honor.

THE COURT: When you met with your attorneys and talked with them about it, were they able to answer any questions you had about the report?

THE DEFENDANT: Yes.

THE COURT: Do you have any questions today

about the report?

THE DEFENDANT: No, sir.

THE COURT: Now, you heard the lawyers talking about the agreement the parties have reached here today. On your behalf, the -- your attorneys have objected to one of the enhancements under 2A6.1(b)(4), and that's a 4-level enhancement for conduct engaged in substantial disruption; and then they have briefed to oppose the government's efforts to increase your sentence under two other guideline provisions.

Do you understand all that and the agreement the parties have reached?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Do you understand you have the right to maintain your objection and make the government prove up that enhancement under 2A6.1(b)(4)?

THE DEFENDANT: Yes, sir.

THE COURT: And it's your decision that this is in your best interest to reach this agreement with the government?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Very good. All right.

Ms. Lundquist, the government had noted the intent to call some witnesses in this case. Is that deemed -- are you going to be calling any witnesses here today?

MS. LUNDQUIST: We'll be calling one witness, Your Honor.

THE COURT: All right. Very good. You may call your witness.

MS. LUNDQUIST: The United States calls John Matias.

JOHN MATIAS,

called as a witness, being first duly sworn or affirmed, was examined and testified as follows:

THE COURT: Thank you. Please have a seat. When you are comfortable, please state your name.

THE WITNESS: John Matias.

THE COURT: Thank you.

Please proceed.

DIRECT EXAMINATION

BY MS. LUNDQUIST:

Q. Sir, where do you work?

A. I'm a police detective with the Cedar Rapids Police Department, currently assigned to the FBI's Joint Terrorism Task Force.

Q. Could you briefly describe your training and experience?

A. I have attended the Iowa State Police Academy. I've also attended numerous training on burglary investigations, homicide investigations, sexual abuse

investigations, financial investigations. Most recently, I have attended training at the Joint Terrorism Task Force in Quantico, Virginia. I've also trained -- attended FBI training in Seattle on domestic terrorism and also trained -- attended training in Albuquerque, New Mexico on counterterrorism investigations.

Q. Sir, are you the case agent in the investigation of defendant Carl William Stuber --

A. I am.

Q. -- for threat offenses?

A. I am.

Q. How did that investigation begin?

A. We initially received a report and a request from the Cedar Rapids Police Department for FBI assistance in this investigation since it involved threats that were occurring across state lines to a bank.

Q. And when was that?

A. October of 2018.

Q. And what did you understand had happened at the bank?

A. The bank was receiving numerous threats over the phone from the defendant, threatening to kill the employees, to call in false fire alarms, to call in false police reports, to commit a Columbine-type shooting at the bank.

Q. And did -- in response to those calls, did an employee call the police?
A. Yes, employee Scott Manchester did call the police, and a police report was subsequently made by the Cedar Rapids Police Department.
Q. Were any charges filed?
A. Yes. State harassment first-degree charges were filed.
Q. Okay. And did you collect any witness statements from employees at the Cedar Rapids Bank & Trust?
A. Yes, I did.

MS. LUNDQUIST: Your Honor, at this time I would move for admission of Exhibit 1.

THE COURT: The government filed a sentencing memorandum at document number 36, in which it attached Exhibits 1 through 10. Is there any objection to any of those exhibits?

MR. TINDAL: No, Your Honor.

THE COURT: 1 through 10 will be received.

(Whereupon, Exhibits 1 through 10 were received.)

THE COURT: And while we're at it, the defense filed a sentencing memorandum at document number 37, attaching Exhibit A. Is there any objection to Exhibit A?

MS. LUNDQUIST: No, Your Honor.

THE COURT: A will be also received.

(Whereupon, Exhibit A was received.)

THE COURT: A I think should be filed, and I think it was filed, under seal. Is that correct, Mr. Tindal?

MR. TINDAL: Subsequent to filing it, I filed an application to put it under seal, and I believe it has been sealed since.

THE COURT: Then it will be filed under seal.

All right. You may proceed.

MS. LUNDQUIST: Thank you, Your Honor.

Q. Putting Government Exhibit 1 on the screens, are these copies of witness statements that you received from employees at Cedar Rapids Bank & Trust?

A. Yes, this was originally an e-mail I received from bank employee Shelley Sweet that contained e-mails.

Q. You talked a little bit about what defendant -- what types of things defendant was saying in the calls. Why in particular was defendant calling that bank, Cedar Rapids Bank & Trust?

A. He received payments from a trust account, and he was wanting more money from that trust account from the bank, and wasn't satisfied with what payments he was receiving.

Q. Okay. And in these statements, witnesses recounted

some of the statements that defendant made?
A. Correct.
Q. Okay. And throughout these -- this 5 pages or 6 pages of statements, there's times when people talk about getting calls from different numbers. For instance, we have Dara Gibbs's number; at another point, they talk about the Chris Wolf number. What is that referring to?
A. We found during the course of the investigation that defendant would often change his telephone number because sometimes the bank would not take his calls so they would go directly into voicemail. So we learned through the investigation that he quite frequently changed his telephone number.
Q. And how many different numbers was he using?
A. I believe there were at least five or six different numbers that we found out through service of a legal service [sic].
Q. Did he in fact make statements about changing his numbers to the employees?
A. Yes, on one occasion he did say that he could change his number and disguise it to make it look like it was an Iowa number.
Q. And that made it difficult to avoid his calls?
A. Yes.
Q. Okay. At some point were you made aware the

defendant had called the fire department to the bank?
A. Yes, I was.
Q. Could you please describe his call and the fire department response?
A. The Cedar Rapids Fire Department received a call, I believe it was on October 26th of 2018. It was called into the emergency dispatch center, said that there was a structural fire at Cedar Rapids Bank & Trust at 500 First Avenue Northeast. The caller was a male voice, and the telephone number came back to a number attributed later to the defendant. The fire department ended up responding. They sent at least seven or eight engine and truck units to the bank, and determined it was a false alarm, false call.
Q. With lights and sirens?
A. Yes.
Q. Okay. And from your investigation, what are some of the measures the bank took in response to defendant's threats?
A. The bank ended up hiring off-duty Cedar Rapids police officers for approximately six weeks to work the bank starting in November of 2018 out of concern that the defendant may followthrough with his threats and come to the bank and cause harm. They also set up special lines so that when his number would come into the bank, it

would go into a recorded line and be forwarded either to voicemail or to a particular employee, that employee being Rick Seger, who was the new loan officer who took over the trust account.
Q. And you mentioned I believe a plain-clothes officer. How long did that go on?
A. That went on for approximately six weeks, started in November of 2018.
Q. And that officer would remain stationed at the bank while the bank was opened?
A. Yes. It rotated. It was a different officer usually every day, but yes, they worked from the opening of the bank around 8 o'clock in the morning until the close of hours, at 5 or 5:30.
Q. And then did you at one point provide the bank with contact information for a victim counselor?
A. Yes, I did. I provided the name of Karen Gale, who is the FBI's victim specialist and coordinator.
Q. To your knowledge, why was that requested?
A. Ms. Sweet from the bank, who was the security officer, contacted me and advised there were several employees of the bank and the call center that were having a hard time dealing with this emotionally. It caused a lot of anxiety and paranoia because of the threats that the defendant was making towards the bank

and to them personally.
Q. And you mentioned that defendant is a bank customer. How long has he been a bank customer?
A. I believe at least since 2017. I don't know the exact date, but I believe from the records I've seen, at least to 2017. He was a bank customer at Guaranty Bank at first where the trust was set up, and Cedar Rapids Bank & Trust subsequently acquired Guaranty Bank & Trust.
Q. I want to go back and talk about the calls in October. We talked a little bit about defendant making statements that he could change his number. Did the defendant make other statements about restraining orders?
A. Yes, he did. On several of the calls, he stated that he was aware of the fact that there were warrants out for his arrest, but he was -- knew he was safe in Colorado, that he would not be extradited out of there.
Q. And did he make these statements while a police officer was present at the bank?
A. Yes. Officer Crist of the Cedar Rapids Police Department was present back on October 26th when the original police report was made. At that time the defendant did call the bank and was put on speaker phone, and the defendant did make a statement to that effect, that he was not scared of the police and that he knew that they would not arrest him on the outstanding

warrants. One of the warrants was through Iowa for the defendant.

Q. To your knowledge, can the bank move the trust or have someone else become the trustee?

A. No, they can't. From my conversations with Mr. Seger, the bank loan officer, the bank was looking into it and wanted to have the State of Iowa or the courts appoint a designee to administer it so they wouldn't have to deal with it, but they were unsuccessful in doing that so they still have the trust account.

Q. After October 2018, did the defendant continue to make threatening calls to the bank?

A. Yes, they occurred almost up until the time he was arrested on the federal charges, which was June of 2019.

Q. For instance, did the defendant call the bank in November of 2018 and make a reference to what had happened in the news?

A. Yes.

Q. And what was that a reference to?

A. I believe that was reference to a shooting that occurred out in California at a country music bar where 12 people were killed.

Q. During the course of your investigation, have you spoken with defendant's father, Carl William Stuber III?

A. Yes, I have.

Q. What did he say about his relationship with his son?
A. It has been estranged. He stated he's been having problems for close to 10 to 12 years, with his son constantly harassing him and texting him and sending threatening messages to Mr. Stuber, Senior.
Q. At one point did Mr. Stuber have a protection order against defendant?
A. Yes, I believe back in 2015, he had one filed through Georgia.
Q. Okay. And did Mr. Stuber provide you with text messages that he received from his son?
A. Yes, he did.
Q. For instance, he would provide you with -- putting on the screen Exhibit 2.
A. Yes.
Q. Okay. Turning to page 5 of Exhibit 2, there's a picture there. Who is that?
A. That would be Mr. Stuber, Senior's, fiancée, Kathy Langenberg.
Q. And where is that picture from, to your knowledge?
A. I believe that's from her website for Coldwell Hedges Realtors, for her business as a realtor or real estate agent.
Q. Turning to page 7 in the middle, is there an address there?

A. That would be the address for her office on Blairs Ferry Road -- or Blairs Forest Way.
Q. Have you spoken to Ms. Langenberg during this investigation?
A. Yes.
Q. Has she received calls and messages from the defendant?
A. Yes, she has.
Q. For instance, did she receive a voicemail from defendant in January of '18?
A. Yes, she did.
Q. Generally speaking, what was the substance of that message?
A. I believe it was something to the effect that he was going to get $106,000 that he was owed, and that he knew people that specialized in computers, and that he wanted her to stop interfering with his father.
Q. Did he also mention she would pay?
A. Yes.
Q. And in June did defendant's father receive any text messages from defendant?
A. Yes, he did.
Q. And are these those messages --
A. Yes, that is.
Q. -- putting Exhibit 3 on the screen?

All right. During the investigation, did you speak with Ms. Ashleey Valladares?

A. Yes, I did.

Q. Who is Ms. Valladares to defendant?

A. I believe she's the former girlfriend and also the mother of two of the defendant's children.

Q. Did she provide you with any communications that she had received from defendant?

A. Yes, she provided me with a Facebook message that she received from the defendant, and I believe a video as well.

Q. Putting Exhibit 5 on the screen. Is this that message?

A. Yes.

Q. And with this -- or at some point you also received from her a video; is that correct?

A. Yes.

Q. Okay. Turning to Exhibit 6, is this that video?

A. Yes, that is correct.

(Whereupon, the recording was played.)

Q. And where does it seem that this video -- where -- would you tell us what's happening in this video?

A. I believe it's at a court proceeding in Denver, Colorado. I'm not certain, a hundred percent certain of that, but that's what I surmise. It's a court

proceeding.

Q. Did you also receive another -- another Facebook message from Ms. Valladares?

A. Yes.

Q. And what was the general substance of that?

A. That I hope -- the defendant stated he hopes she moves out of the country, that he was going to come down to Georgia, and that -- hopes that she enjoys the kids because he's going to take them away.

Q. Is there a history of threatening messages between Ms. Valladares and the defendant?

A. Yes, she advised there was.

Q. In April of 2019 did she seek a protection order?

A. Yes, she filed one in Forsyth County, Georgia, against the defendant.

Q. And is this, Exhibit 7, which is on the screen, a copy of the petition she filed in support of that order?

A. Yes, it is.

Q. How long was it in effect?

A. I believe three months or two months.

Q. In June of 2019, did defendant send a series of threatening Facebook messages to his mother?

A. Yes.

Q. And who all did defendant threaten in those messages?

A. He threatened her, his mother. He threatened Ashleey Valladares, and he threatened to also kill Dara Gibbs, and he threatened to kill his father.
Q. Putting Exhibit 8 on the screen, the first words there, "I'll get you too. I'll speed that cancer up," who would that be directed to?
A. I believe that's to his mother, Anita Eggleston.
Q. And then, there's a picture at the bottom of this first page. What is it that's at the bottom of that picture?
A. I believe that's a picture of his -- of a dog that belongs to the defendant and to Dara Gibbs.
Q. And what's happening in that picture?
A. You can't see it very well in the photo here, but it appears that there's blood on the dog, and you can see a hand holding a knife next to the dog's neck.
Q. And how did you receive a copy of these messages?
A. I received them from Mr. Stuber, Senior.
Q. Was he concerned about them?
A. Yes, he was.
Q. And, in fact, throughout this investigation did he frequently express concern over his son's threats?
A. Yes.
Q. And was it your belief initially that defendant had in fact killed these dogs?

A. Initially, yes, it was.
Q. And based on the messages on page 2 at the bottom and from your understanding, was it also Mr. Stuber's and defendant's mother's belief that he had killed these dogs?
A. Yes, I believe so.
Q. And you mentioned they belonged to the defendant and Ms. Gibbs, defendant's fiancée. At the time of these photos, what was defendant's relationship with Ms. Gibbs?
A. It was estranged. She had been living with him in Colorado, but she had gone back to Georgia.
MS. LUNDQUIST: Nothing further, Your Honor.
THE COURT: Cross-examination.

CROSS-EXAMINATION

BY MR. TINDAL:
Q. Is it officer or agent? How should I refer to you?
A. Officer is fine, sir.
Q. Officer Matias, you first became involved in this investigation in October of 2018, correct?
A. Yes, sir.
Q. And throughout this investigation, there were periods of time where there were threats and then periods of time where there were no threatening communications, correct?
A. Yes, sir.

Q. And the periods of time in which there were threatening communications appeared to be bunched together, where there were numerous within a few days of one another, correct?
A. They appeared that way, yes, sir.
Q. And were you able to communicate or have other officers interview Mr. Stuber at any point from October of 2018 until his arrest on these charges?
A. No, sir, other than when the Cedar Rapids police officer, Officer Crist, tried to interview him on the phone on the 26th of October of 2018 when he called the bank.
Q. But no one was able to communicate with him face-to-face, correct?
A. No. For some time he was at large and homeless and we didn't have a current address on him.
Q. You were aware that he had a long history of mental illness, correct?
A. I was told that, yes.
Q. Who told you that?
A. His father told me. The defendant himself would make statements on phone calls that he had mental illness, bipolar and PTSD.
Q. Did his mother also tell you that?
A. Yes, she did as well.

Q. And what efforts did you make to try to understand or investigate the mental illness that he suffered?
A. I'm not sure I understand the question.
Q. Did you ask his mother to provide you medical records, for example?
A. I did not, no.
Q. Did you explore what his formal diagnoses were?
A. I did not, sir.
Q. Why not?
A. I have no answer for that, sir.
Q. His father had indicated he had received threats over a long period of time, correct?
A. That's what he told me, yes, sir.
Q. Were you aware that his father had had abusive relations towards his son when his son was very young?
A. Other than what I heard from the defendant, no, I was not aware of any independent information.
Q. Did you follow-up to seek any corroboration of those statements from the defendant, for example, asking his mother about it?
A. I don't recall if I did ask her that or not, sir.
Q. Okay. You mentioned the no-contact order that's marked as Government's Exhibit 7. That was the one that actually Ashleey Valladares sought in Georgia. Did you obtain a copy of this petition for no-contact order?

A. Yes, I did.
Q. Do you know whether that petition for no-contact order was ever served on the defendant?
A. It was not. They were not able to serve it.
Q. And in fact, the no-contact order was subsequently dismissed for the lack of service, correct?
A. Yes, sir.
Q. So to your knowledge, the defendant wasn't ever aware even that the petition had been filed, was he?
A. I don't know, sir. If -- Ms. Valladares might have told him. I'm not sure if there was any communication.
Q. Let me ask that slightly differently then. Nothing in your investigation revealed that the defendant had knowledge that this no-contact order existed, correct?
A. Correct, sir.
Q. With respect to Government's Exhibit 8, in the photographs of the dogs that are in those text messages, you subsequently learned that the dogs were alive and healthy, correct?
A. Correct.
Q. That what is exhibited in those photographs is actually ketchup, correct, as opposed to blood?
A. Correct.
Q. Now, it's your testimony that the bank attempted to name an alternate trustee?

A. Yes.
Q. When did that happen?
A. Sometime after 2019 I believe, in conversations I had with Rick Seger of the bank, that they were --
Q. Did you ever see any paperwork that was filed?
A. No.
Q. Did you ever ask to see any paperwork that was filed?
A. No, I did not.
Q. Did you ever see a court order denying the bank's request?
A. No, I did not.
Q. How long was this conversation about the bank's efforts to nominate an alternate trustee?
A. I believe it may have been one or two conversations I had with Mr. Seger.
Q. And approximately how long were those conversations?
A. Either on the phone or in e-mail, I don't recall which, but they were just brief conversations, just checking to see if the bank was able to do that or not.
Q. And who -- who brought up the topic? Did you bring it up or did the bank?
A. Originally, the bank. Mr. Seger is the one that told me that they were looking into it, and then I may have asked later on whether they were successful or not.

Q. And was there any explanation given to you as to why they weren't successful?
A. No.
Q. Do you -- did you ever look at a trust schedule or determine how much income the bank received off of managing this trust?
A. No, I did not.
Q. Did you ever learn when the trust was established?
A. I don't have the exact date for that, no. I just know it was set up on Sophie Stuber's behalf, who is the defendant's grandmother.
Q. And was that established on her death?
A. I believe so. I'm not certain of that.
Q. And when you say that Mr. Stuber was a customer of the bank since 2017, is it possible that he was actually a customer of at least Guaranty Bank since 2011?
A. Yes, that's entirely possible. The bank records I had just went back to 2017, so I was just referring to that's as far as I knew.
Q. So essentially, it would be true then that he has been a customer as long as you could go back in the records?
A. Correct.
Q. Okay. Prior to today's sentencing hearing, did you review all of the exhibits that were presented to the

Court?
A. Yes.
Q. Did those include the exhibits that were attached by the defendant, Exhibit A?
A. I'm not sure.
Q. Did you review any records from Four Oaks or related to a juvenile in need of assistance action?
A. No, I did not review that. Just the exhibits that were provided by Ms. Lundquist I reviewed.
Q. All right. She did not provide you with a copy of the defendant's sentencing memorandum or the attached exhibits?
A. I did not review that or see that.
Q. Okay. Okay.

(Defense counsel conferred.)

MR. TINDAL: Nothing further at this time, Your Honor.

THE COURT: Any redirect examination?

MS. LUNDQUIST: No, Your Honor.

THE COURT: Thank you, Officer. You may step down. You are excused.

Does the government have any other witnesses it wishes to call?

MS. LUNDQUIST: No, Your Honor.

THE COURT: Mr. Tindal, does the defendant wish

to call any witnesses?

MR. TINDAL: No, Your Honor.

THE COURT: All right. Here's how we're going to proceed then. I'm going to now go through the calculation of the advisory guidelines as set forth in the presentence investigation report. Then we're going to talk about the supervised release special condition; I'll hear from any victims, if any victims wish to address the Court; and then I'm going to hear argument from the parties on the guideline departures, the variances, and the ultimate disposition the Court should impose; and then I'll hear from Mr. Stuber if he wishes to say anything.

So turning to the calculation of the advisory guidelines, both offenses are grouped together in a single group. The calculation of the guidelines begin at page 12 of the presentence investigation report.

At paragraph 33, the defendant has been assessed with a base offense level of 12 under section 2A6.1(a)(1).

At paragraph 34, the probation office has assessed him with a 2-level enhancement under section 2A6.1(b)(2)(A), because the offense involved more than two threats.

At paragraph 35, the probation office has assessed

the defendant with a 4-level enhancement under section 2A6.1(b)(4), because the offense resulted in substantial disruption of public, governmental, or business functions or services.

That leaves us with an adjusted offense level of 18. The defendant has pled guilty to these offenses, and so the probation office has awarded him with a 2-level reduction for acceptance of responsibility under section 3E1.1(a) of the guidelines.

Ms. Lundquist, what is the government's position about whether the defendant should receive an additional 1-level reduction for entering a timely guilty plea under section 3E1.1(b)?

MS. LUNDQUIST: The United States moves for the third level, Your Honor.

THE COURT: The Court will grant that motion. So with 3 levels off for acceptance of responsibility, the defendant's total offense level would be 15. The defendant has some criminal history, which the probation office has summarized and scored, beginning at paragraph 44 and continuing over to paragraph 53. The defendant's prior convictions have resulted in 10 criminal history points. The defendant committed the instant offense while under a criminal justice sentence in three different cases, so 2 additional points were added for a

total of 12 criminal history points. That places the defendant in criminal history category V. So with a total offense level of 15, criminal history category V, the advisory guideline range of imprisonment is 37 to 86 [sic] months.

Let's talk about the special condition --

MR. TINDAL: Excuse me, Your Honor, I believe the Court said 37 to 86. I believe the range is 37 to 46.

THE COURT: If I said 86, I apologize. 37 to 46 months, yes.

Let's talk about the supervised release special condition. It is the government's burden to establish that condition, so, Ms. Lundquist, I'll hear first from you.

MS. LUNDQUIST: Thank you, Your Honor. The defendant stipulated that the bank, its employees, Ms. Ashleey Valladares, and Dara Gibbs, were all victims of his offense. The evidence before the Court contains threats to the lives of Ms. Valladares and Ms. Gibbs, as well as threats communicated directly against the bank and its employees. There are a number of them in this record. And based on all of that, there is a sufficient basis for the condition, and the Court should impose that no-contact condition.

THE COURT: Ms. Lundquist, what -- what is your solution? The defendant is a beneficiary of a trust that is run by a bank. I can't imagine that there -- that we can bar the defendant from having any communication with the bank that is the trustee when he is the beneficiary of that trust. Do you have a solution to that issue?

MS. LUNDQUIST: Well, Your Honor, the defendant will have ample time to work out a solution to that issue while he's on supervision with his supervising officer.

THE COURT: All right. Mr. Tindal.

MR. TINDAL: Your Honor, I'm not sure how that is satisfactory necessarily, because he continues to be a trustee [sic] as we stand here today and while he is incarcerated. The trust still has obligations to him and has a requirement to distribute funds for his benefit, whether that is to place money on his books or to provide funds so that he can maintain the property he does own while he is incarcerated. And so I think that, ultimately, we would request that the Court permit contact so long as it is contact concerning the trust.

Potentially, the Court could limit that contact to electronic or written correspondence as opposed to telephone calls or in-person contact. I think that may be the appropriate balance to accomplish both the protection or at least the security for the bank, while

also permitting ongoing communication about matters of need.

I -- as an attorney in Iowa who has practiced or had practiced for a number of years in the world of trusts and estates, I find it difficult to believe that a court would deny the bank's request to appoint an alternate trustee so long as an alternate trustee had been offered. So that would always be an option for the bank; and if they no longer become the trustee, then we don't have these issues.

Also, Your Honor, frequently, we have individuals in state court who have children with one another who have no-contact orders, so it is not an uncommon term to allow communication concerning the children. Often that is through text or other documentary needs. So I think that if the Court were to fashion the no-contact order to permit limited narrow communication, that that would be an appropriate term that we would not object to. But to not permit any contact by the defendant with the trustee to -- which holds the trust to which he is the beneficiary of, I think is unreasonable under the circumstances, Your Honor.

THE COURT: Thank you, Mr. Tindal. Limiting the communication to simply discussions about the trust itself would not address the problem here. The

defendant's threats to the bank were in connection with that very trust. On the other hand, part of the defendant's problem is this -- the spontaneity and the emotional lack of control that resulted in phone calls and Facebooks and e-mails and so forth where he exercised no self-control and resulted in the threats.

So here's what we're going to do. I'm going to limit any contact with the bank to contact only through the United States mail. So that excludes FedEx or any other commercial entity. Any communication with the Cedar Rapids Bank & Trust must be through the United States mail only, and it must pertain only to the trust itself.

I have no control over the defendant's communication while he's in the Bureau of Prisons. My conditions -- I can only impose conditions for when he is on supervised release. So what happens while he's with the Bureau of Prisons will be up to the Bureau of Prisons. They, of course, will be monitoring his phone calls and his mail, and presumably will report to authorities if there's any inappropriate communication.

So I am sustaining in part and overruling in part the objections. To the extent -- to the extent the defendant's objection at paragraph 96 also objected to the inclusion of D.G. and A.V. on the list of protected

parties, the Court overrules that objection.

All right. Ms. Lundquist, are there any victims who wish to address the Court here today?

MS. LUNDQUIST: Yes, Your Honor.

THE COURT: I'll hear from that victim now.

And, sir, if you could, it's going to be important that you're able to be heard, and so if you could come up to the counsel table, there's a microphone at the end of the table, and you can sit there and address the Court.

MR. STUBER, III: I appreciate your time this morning, Your Honor. I'm Carl Stuber III, the defendant's estranged father.

I am hoping and asking in regards to the fines that are going to be levied and the penalties that it will not deplete his trust account in the hopes that some day, when he is released and on probation, he has something to work with, acquiring a residence, setting up employment; just something that he can work with and not go out on the streets being homeless, broke, and no money.

And along those lines, I'm also hoping that he can be assigned to a facility where he can get some mental health treatment, perhaps an education, maybe learn a skill or a trade, so that when he does go out and he has a parole officer, he can have a job and start contributing to restitution or taking care of his

children and doing something positive and getting his life turned around, because I think a skill and a trade and a job and being in a structured environment post-prison release would be the best benefit for him and for all of us, because I don't want to go back to the way we were living in the past, with the harassments and the phone calls and the arguing. It takes a toll on you emotionally and physically. And I speak for myself and my fiancée.

It's difficult to be up here today too. It's -- you know, it's not something you want to do. You're not proud of it. But I hope we can help him and get his life turned around and make this an opportunity for him to be somewhere where he can learn something, rather than, you know, being close to home. I don't know where that place is. I can't tell you. But I'm just hoping we can turn this into a positive, and he can benefit for himself and his kids, and we can all live quiet lives and not the turmoil that we have been in for years.

I thank you.

THE COURT: Thank you, Mr. Stuber.

All right. At this point, then, I will hear from the parties regarding both the departure -- departures and variances. There are motions for an upward departure from the government and, in the alternative, upward

variance; and motion for a downward departure and downward variance in the alternative from the defense. So I'd ask the parties to take all those issues up at the same time; and then ultimately tell me the disposition you believe would be appropriate in the case.

So, Ms. Lundquist, I'll hear from you first.

MS. LUNDQUIST: Thank you, Your Honor. First, I'd like to address the government's motion for an upward departure in this case. The sentencing guidelines provide for an upward departure if the defendant's offense involved substantially more than two threatening communications to the same victim, prolonged period of making harassing communications to the same victim, and multiple victims. And that's three out of the four possible bases for this departure, and the facts here satisfy all three of those.

Defendant made substantially more than two threatening communications. Two were directed at the same victims. And he made them over a prolonged period of time. Looking at Government Exhibit 1 and the statements from the employees at the bank, and turning especially to the second page, it notes that it looks as if the -- his calls on October 25th and 26th consisted of more than 40 phone calls to the bank, during which he made a number of harassing and threatening statements.

And those were directed at a number of different employees, but all of the same bank.

He's also been threatening his father for a number of years, such that he had to get a restraining order in 2015. He's also threatened his fiancée on several occasions. And he's threatened his exgirlfriend, Ashleey Valladares, over a period of years. Looking at Government Exhibit -- I believe it is 7, the statement Ms. Valladares offered in support of the protective order she sought in Georgia in April, at page 3 she talks about the number of messages she's constantly received from the defendant and that this has been going on for years. And we also saw one of the Facebook messages that defendant sent her, along with a video of him actually sitting in a courtroom and flashing the finger at the camera. And she is someone who had pressed charges against him previously, and he was convicted of terroristic threats against her, I believe in 2013.

The United States also makes a motion under 4A1.3 for underrepresented criminal history. It's another bases for an upward departure here. His criminal history category substantially underrepresents the seriousness of his criminal history and the likelihood that he will commit other crimes. He has dismissed charges for willful obstruction, fugitive from justice, as noted in

paragraphs 59 and 60. He has pending charges for assault, felony menacing, child abuse, violation of a protection order, threats to person/property, disturbance by phone and harassing phone calls, convictions for domestic abuse, violation of a family violence order, terroristic threats, and criminal trespass.

MR. TINDAL: Your Honor, I'm just going to object to the Court's consideration of unproven/unconvicted criminal history.

MS. LUNDQUIST: I would note in response that there are no objections to these in the -- in the presentence report, and the probation office notes makes notations with regard to just pending charges and the consideration they merit.

MR. TINDAL: I'm not objecting as a matter of fact. I'm objecting as a matter of law.

THE COURT: Let me just address this objection. First of all, there is no limitation on the type of information that a court can consider in determining a sentence. With regard to an upward departure under 4A1.1 -- or I'm sorry, 1.3, the Court can also take into account pending charges and the conduct reflected under the pending charges. That said, because they're pending, because they have not been proven, because they are nothing more at this point than allegations, they carry

fairly little weight with the Court.

The paragraphs in dispute here are paragraphs 55 through 58. And in each of those, the narratives indicate that these are the accusations, the incident reports state this or the records state that. So they are not a statement of what the facts actually are. They are a statement of what the facts are alleged to be, and the defendant did not object to those, and most likely because the defendant is in no position to object that that is in fact what the complaints say or what the reports say. So at this point they're simply unproven allegations.

Nevertheless, the law allows the Court to take those into account, and I will to some degree I suppose, but they carry little weight with me because they are unproven.

You may proceed.

MS. LUNDQUIST: Thank you, Your Honor. And the United States notes those as prior similar adult criminal conduct not resulting in a criminal conviction under subsection (2)(E) to 4A1.3.

THE COURT: Again, my concern, Ms. Lundquist, though is they're not proven conduct. And so if the Court had heard evidence on each of these pending charges establishing facts that I can rely on, I would be in a

better position to actually give those weight. At this point, all I have is accusations. So that's the difference between what -- whether this would carry a lot of weight with the Court or whether it would not. So, just so we're clear.

MS. LUNDQUIST: Thank you, Your Honor.

Additionally, under the government's upward departure motion under 4A1.3, we would note the defendant's history on supervision has been very poor with failures to appear and probation violations. At the time of this offense he had four detainers pending against him. And over nine years, it appears from the presentence investigation report, defendant has been engaging in similar criminal conduct. Pending arrest warrants, convictions, protection orders, none of them have stopped him from engaging in similar behavior. And based on all of this, the defendant is highly likely to reoffend, and the Court should depart upwards.

Moving on to the defendant's downward departure motion under 5K2.13, he seeks that for a significantly reduced mental capacity. However, he provides no evidence that he was suffering from a significantly reduced mental capacity in 2018 and 2019, which is largely the facts and circumstances of this case, when they date from.

Defendant's Exhibit A consists of medical records dating from over 20 years ago when defendant was seven, eight, nine years old. There are no recent diagnoses for defendant anywhere in the record that I can see, and no evidence especially that any mental impairment he might have contributed to his offense in this case.

Moreover, this departure would remain inappropriate here even if he had provided such evidence because his offense involved a serious threat of violence. His -- his offense consisted almost entirely of serious threats of violence, and the facts and circumstances show a need to protect the public and indicate a need to incarcerate defendant to protect the public.

And finally, moving on to the competing essentially motions for variances under the 3553(a) factors, the government would ask the Court deny defendant's motion for a downward variance and vary upward. I should note that going back to the government's motion for an upward departure and the amount of a departure that we're seeking, because defendant meets three of the four possible bases under that departure note noted in advisory note 4 to 2A6.1, the government would ask that he be awarded 1 level for each of those bases and be moved up to a 51 -- a base offense level of 18, category V, 51 to 63, and that the Court impose a sentence at the

top of that range. And we would make that request as well under the 3553(a) factors, which I will now address.

The 3553(a) factors support a sentence at the top of that new guideline range. Looking at the nature and circumstances of defendant's offense, his offense consists of threatening to kill people to get what he wants. He calls the bank when he wants more money. He threatens to kill the employees that he talks to. He sends his dad messages asking for more money, threatening to kill or harm his fiancée, sending her picture, her address, saying that "You know the black web. You can get whatever you want."

Looking at -- as I mentioned, defendant called the bank more than 40 times in two days in October, and he continued to call them for months, up until June when he was arrested. The Court has seen the statements from the employees. He would rant and shout. He threatened to kill them, beat them, Columbine the bank. He wanted them all to die. When he did this, he used different numbers, which made it difficult for employees to know when they were going to pick up the phone and speak with him in this manner. The bank had to hire a victim counselor to come and give presentations because the employees were upset because of receiving these calls. He also falsely reported a fire to the bank, causing seven units of the

Cedar Rapids Fire Department to roll out with lights and sirens and respond to his false call.

And then, moving on, defendant has, as I previously mentioned, been sending threatening communications to his father for years. And he tells everyone that he's going to kill his father if they don't do what he wants. It's aggravating that when -- he frequently doesn't threaten only the person he is talking to. He uses other people's lives as bargaining chips, "Do what I want or I'll kill this other person." He has also threatened his father's business, fiancée.

He's threatened really everyone of significance in his life. The bank that holds his trust and pays all his bills. A former attorney, who he's made threats to his office and caused the office to be locked down for security. Repeatedly telling his father and others that he's going to kill him. His mother, "I'll speed that cancer up. I'll get you too." His fiancée, in a call we submitted I believe as Exhibit 4, he's going to drag her by her F-ing hair, F her up, F her family up. Looking to the paragraph of the presentence investigation report with the messages from June, she's dead, her exgirlfriend Ashleey is dead as well. And all of these things -- just the continued nature of defendant's contact and messages is really egregious here and is aggravating.

Looking at defendant's history and characteristics -- well, going back, excuse me, to the defendant's -- the nature and circumstances, I'd also note that throughout these messages, there's also a significant lack of respect for law enforcement and the law. Looking at the message defendant sent to Ashleey Valladares, Exhibit 5, "F your judges, your charges." He's also said things like "Put a restraining order." He tells employees "I have warrants out. There's nothing you can do." He sends a video of himself in a courtroom flashing the finger. From these statements, he seems to have contempt for anything that the victims could use for their safety: police officers, protection orders, charges, court cases, and warrants.

Defendant's conduct extended far beyond a few threats. And based on this, the Court should vary upward.

Turning now to the defendant's history and characteristics, they also support an upward variance. Defendant has almost no work history or earnings. His life has essentially, it looks like, been paid for by this trust. Many defendants come from impoverished backgrounds or have a lack of opportunity, but that is not the case here. He had means to see that his needs -- educational, vocational, medical -- were met and he chose

to engage in the conduct we've been discussing here today instead.

Turning to his criminal history, I already mentioned he has convictions. In almost all of his convictions, it appears he has violated his probation. You know, in -- turning to 2013 especially, he violated a protection order by texting -- excuse me, turning to 2011, he committed an assault against Ashleey Valladares, who is one of the victims of this case as well, by choking her. He violated his probation and absconded during supervision. In 2013, he violated a protection order by texting Ms. Valladares's mother after she got a protection order when he placed a multitude of threatening calls and texts and broke a car windshield. After this, he was convicted of terroristic threats and criminal trespass, his probation was revoked, and a violation remains pending. And we've already discussed his pending charges, but I would note the allegations are very similar to what we are seeing in this case. And it appears that overall, there's a troubling pattern of similar criminal conduct that is going on with defendant. Threats and phone calls, but also, actual physical assaults against his partners.

Finally, we would note the PSR states the defendant has the ability to pay a financial penalty. Government

Exhibit 10 consists of bank records for defendant's trust and life insurance trust. It looks as if, based on those records, defendant has just under $300,000 in assets. Money is clearly very important to defendant. A lot of this case revolved around his threats to a bank for more money or his dad for more money, and a financial penalty in this case would serve the goal of specific deterrence. So we would ask for a fine within the guideline range.

Just to conclude, the defendant has shown really no respect for the law, and no regard for the safety and the well-being of people in his life and, really, people that he does not even know; and accordingly, a substantial sentence is necessary to deter this type of criminal activity. So we would ask that the Court depart upward 3 levels to 51 to 63 months, and impose a sentence at the top of that range.

Thank you, Your Honor.

THE COURT: Thank you.

Mr. Tindal.

MR. TINDAL: I guess I struggle a little bit with the government's rationale. The government's rationale is essentially this defendant is unrehabilitatable, so let's lock him up and throw away the key. Obviously, this Court knows there is no key to be thrown. This defendant is going to be released. And

I think that essentially the government's argued that he's just been this privileged kid, but I think Defendant's Exhibit A shows that defendant has struggled with a lot of barriers. Barriers that, but for the grace of God, I don't have to struggle with.

For whatever reason, as an attorney in the state system, I've developed a reputation of being able to work with people with mental illness. And I have often been appointed to difficult defendants. And what they all display is a quality of kind of going manic, getting obsessive, and getting angry over those obsessions. That is a consistent pattern through many difficult defendants who unfortunately in this country end up in the judicial system because our quality of mental health in this country has eroded to such a significant state.

What the officer testified to is that there would be patterns of time where there was obsessive reactive behaviors, followed by gaps in which there weren't, and I think that's borne out to a certain degree in the facts of the PSI. This is consistent behavior, not just with this defendant, but with many defendants who suffer from these conditions where they are obsessive and have an inability to control their anger. That is best advantaged through a healthcare system, a mental health system, not a system of incarceration.

Since the defendant has been incarcerated here, he has been on a consistent medication regimen. What I can advise this Court, something the government wouldn't be aware of, is that the defendant who sits here today is a much different person than the defendant I've met at his first court appearance. The defendant I met at the first court appearance had racing thoughts, had distracted thoughts, was unable to focus very long other than on the immediate issue that was his concern, which was how he felt and believed the bank was ripping him off.

This defendant, who has been consistently medicated now for a number of months, is a much different person. And I think there's every reason to believe that if he were on the street and continued to follow that pattern of mental health treatment and care, he would continue to be the different person. It is when he stops maintaining his medications, he gives up on life, he goes back to that pattern of obsessive, angry thoughts.

Now, unlike many defendants who have -- there's a -- there's a universe of these cases that's not that large, all in all. And especially in the Eighth Circuit, there just aren't that many of these cases that at least make it up to the Circuit. And in that world of defendants who are charged with this offense, Mr. Stuber is no exception. He is not a particularly aggravated

defendant. His behaviors are significantly less egregious than many. And most importantly to this Court is, I believe, they're treatable. He's rehabilitatable. Unlike the government, I refuse to give up hope on anyone, let alone my client, Carl Stuber.

And although I didn't have an opportunity to ask his father any questions, I don't think his father's given up hope either. They obviously have a long and tortured history that hopefully over time and with continued treatment and therapy and, frankly, with age, as my client Carl Stuber ages and as Carl Stuber, Senior, ages, hopefully that can heal itself.

But essentially the government's argument to keep him locked up as long as possible doesn't accomplish any of the goals of sentencing. Certainly the punishment aspect of it is incorporated well within the base offense that exists now. There is no grounds sufficient to warrant enhancing or varying above or departing above the current guidelines.

Rather than focusing on the term of incarceration, I would argue that this Court should focus on the term of supervision. There is certainly mental health and structure that can be provided by the Bureau of Prisons, but that's not the real test. The real test is the structure and treatment that follows his release. So I'd

ask this Court to extend the period of supervised release for as long as this Court feels comfortable doing. And rather than balancing it out by increasing the level of incarceration, balance it by increasing the term of supervised release.

Have Mr. Stuber maintain and show his supervising officer that he's taking his mental health medications as prescribed. Let him show that he can become established and founded in this community. If he doesn't do those things, obviously this Court can send him back to a term of incarceration. But to presume he's incapable of that kind of rehabilitation I think goes against everything that our criminal justice system should stand for, particularly in the case of those who have mental health issues.

So for all those reasons, Your Honor, we would actually request that the Court sentence the defendant to a term of 24 months or less, but also sentence him to as long a term of supervised release as this Court feels comfortable ordering.

Your Honor, my client has requested a placement of Englewood, Colorado. He's requested Englewood, Colorado, because it is close to where he resides now, and they also have mental health treatment in that facility as well. Mr. Stuber knows he needs mental health treatment.

Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.

He has utilized this period of incarceration so far to his best potential by continuing to take medication as prescribed and monitoring or managing his behaviors. He has the capacity to do it. He wants to do it.

So for all those reasons, Your Honor, we'd request a sentence of 24 months or less. Thank you.

THE COURT: Thank you, Mr. Tindal.

Mr. Stuber, this is the time in the hearing where you have an opportunity to speak to me directly to tell me anything you'd like me to take into account in determining your sentence. You don't have to say anything. And if you choose not to say anything, I won't hold that against you in any way. But if there is anything you'd like to say, now is the time to do so. Is there anything you'd like to say, sir?

THE DEFENDANT: Yes. First, I'd like to apologize to my father and anybody who I made nervous at the bank, and to the Court for being here. I have a long history of bipolar disorder, so I act out when I'm feeling manic, and sometimes I just do too much and go overboard. I know that they were saying that I didn't have a history of mental health, but, I mean, I have been placed in multiple treatment centers throughout my life, from age six to -- and I didn't get released until I was 16, which in those places I didn't get a very good

education and well understanding of what real life is like, like school. And so I had trouble in school when I got out, and I would act out. And I just -- I've really never learned how to function with -- with my disorder. And as I get older, it seems to get worse because I get older and more stressed and more pain and more problems. And before I got incarcerated this time, I was at a very bad point in my life mentally. And I feel that me acting out was just really a cry for help, and I just did it in the wrong way, and I apologize for it. And I'm just asking to get help instead of being punished. That's all. Thank you.

THE COURT: Thank you.

All right. In arriving at a sentence that is sufficient but not greater than necessary to achieve the goals of sentencing, I have considered all the factors set forth at Title 18 United States Code Sections -- Section 3553(a). Even if I do not mention each of them in my comments here today, I have taken them into account very carefully.

Turning first to the nature and circumstances of the offense, I'm not going to spend a lot of time on this because this was summarized well by the agent in testimony and through the exhibits offered during this hearing. But over a period of time, in 2018 and 2019,

the defendant engaged in a series of threats to numerous people, including a bank and bank employees, including family members, including the mother of his children, including a fiancée, and other people collaterally related to those people. That has caused disruption in a number of people's lives and caused emotional and psychological distress, particularly with the bank employees. This isn't a case of just making people nervous. This is a case of inflicting mental distress on a number of victims by these threats.

Turning to the defendant's history and characteristics, there's been a lot of discussion here about the defendant's mental health, but here's the problem. I have no evidence of the defendant having serious mental health problems at the present. In fact, as the government noted, the only records I have in front of me date back to the time when the defendant was seven, eight, and nine years old. The defendant is now 31 years old. The presentence investigation report reflects at paragraphs 72 and 73 very limited information suggesting the defendant has ongoing mental health problems, if at all. At paragraph 72, it consists only of the defendant's reports. There's no medical records summarized in that paragraph. There is records from Linn County Correctional Center indicating the defendant is on

two drugs. One is for depression; the other one is a sleep aid. Other than that, I have no evidence before the Court that the defendant actually suffers currently from any mental illness or disease that affects -- certainly that affected his conduct, but even that affects how he should be incarcerated or what treatment he should receive. The only evidence I have of a diagnosis appears at paragraph 77, which indicates the defendant was diagnosed while he was in high school with ADHD. That's the only diagnosis that I have of a medical record, other than Exhibit A, which again deals with the defendant when he was seven, eight, or nine years old. So I have very little information that would suggest the defendant is suffering from mental illness or that the mental illness contributed to his criminal conduct.

The defendant has little or no work history. He has earned a GED. His work history results -- or is unverified, and to the extent it existed, I don't have good information about hours he worked, whether it was full-time or part-time. It looks like he largely worked in service industries. The financial records from the Social Security Administration at paragraph 81 suggests the defendant has earned very little money. Again, he's 31 years old. There's no excuse. Up until the pandemic hit, the economy was at an all-time low of unemployment.

Why this defendant is not working is not known, other than he has a trust account that apparently pays for his livelihood and so apparently he doesn't need to.

The defendant has a serious criminal history, and it's a troubling criminal history. By my count, the defendant has six adult convictions, one of which involved assault causing bodily injury. He has violated no-contact orders. He has threatened people. And four of the convictions occurred -- or four of the conduct that resulted in convictions occurred while the defendant had other charges pending and while he was on probation. So this is a defendant that not only makes threats, but at least in one instance has actually carried out a threat and assaulted his -- the mother of his children by grabbing, choking, and scratching her in a manner that caused bodily injury. So the defendant has caused both psychological and mental injuries by his criminal conduct here and has demonstrated by his conduct that he has carried out on prior threats. All that is pertinent to the Court's conclusion that the defendant poses a real danger to the community.

I don't know why he can't control his temper, but the fact is, he can't or chooses not to control his temper. I have no evidence in front of me that would suggest that he has an inability due to mental health

issues. And so I'm denying the defendant's motion for a downward departure under 5K2.13, diminished capacity. That requires that the Court have some evidence before it the defendant was actually suffering from a reduced mental capacity at the time of the offenses, and I find I have no evidence of that in front of me.

Even if that were the case under the departure provision, I find that the facts and circumstances of the defendant's offense indicate a need to protect the public because it involved a serious threat of violence and the defendant's criminal history indicates a need for incarceration.

Regarding the government's motion for an upward departure, I find an upward departure is appropriate under application note number 4, under 2A6.1. The defendant engaged in substantially more than two threatening communications. Here, we have scores of threats the defendant made as part of a series of conduct that stretched over a 2-year period of time. It also involved a prolonged period of making harassment communication to the same victims, to the point, as I mentioned, that it ultimately caused mental and emotional distress needing intervention by a victim counselor for the bank employees, and it involved multiple victims in this case. All of those are under application note

number 4(B).

And I find that the upward departure is appropriate under that section. I'm denying the government's motion for an upward departure under 4A1.3 for understatement of criminal history score. For that to apply, the Court would have to find the defendant's criminal history category, in this case a V, substantially understates the seriousness of his criminal history and the likelihood of him reoffending. I do think that it does understate the likelihood of him reoffending. His conduct here most certainly would suggest this defendant is very likely to reoffend. He is under probation, violates probation multiple times, continues in a pattern of conduct, shows absolutely no respect for the law, and so I think there is a likelihood of him reoffending. But I find that criminal history category of V adequately reflects the seriousness of the defendant's criminal history and the likelihood of him reoffending, so I'm denying the government's motion for upward departure under that ground.

Regarding the variance, competing variance motions, I find a downward variance is not appropriate. The defendant does have a childhood here in which he was abused. He was both physically and verbally abused. That's reflected at paragraph 65. And he described --

his mother described his childhood as not good. Again, he was diagnosed with ADHD and had been in treatment centers, as he mentioned in his allocution, from childhood until about the age of 17. And those are mitigating factors, but I find the aggravating factors of this offense outweigh the mitigating factors sufficient that a downward variance is not appropriate.

If I am in error regarding the upward departure, I would vary upward to the same extent under the 3553(a) factors.

So taking into account all the factors set forth at Title 18 United States Code Section 3553(a), I find that an upward departure and an upward variance is appropriate. This is the first case in which I've done this, but I'm going to impose a sentence above that that the government has requested here because I find the defendant is a danger to the community. That is one of the goals of sentencing, is the Court impose a sentence sufficient to protect the community from a defendant.

I also have to impose a sentence sufficient to reflect the seriousness of the offense. In this case, as I've noted repeatedly, this offense was very serious. The defendant's not just using words. He is causing mental and physical -- I'm sorry, mental and psychological distress and injury to other people through

his repeated threats and harassment. Those are real injuries that the defendant has caused to other people. He caused significant disruption to a bank and to a law firm as well through his threats. And so this defendant is out of control and has seriously damaged other people, and this sentence must reflect the seriousness of that offense.

I also need to impose a sentence sufficient to deter this defendant. The defendant has been charged, convicted, incarcerated, sentenced before, and none of that has deterred him from engaging in this type of conduct. He needs to understand that if he threatens other people, there will be serious consequences that will be visited upon him.

And so it is the judgment of this Court, Mr. Stuber, that you are hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of 72 months. This term consists of 60 months on Count 2, and 12 months on Count 3 to be run consecutive to the term on Count 2. It is ordered that the term of imprisonment for the instant offense be served consecutive to any term of imprisonment that may be imposed in DeKalb County, Georgia, case numbers 11CR3756, and 13CR2585; Adams County, Colorado, case number 2018M1085; Denver County, Colorado, case numbers

2018CR7237, 18GS011728; and Forsyth County, Georgia. That has no docket number assigned to it. This is all under Title 18 United States Code Section 3584.

It is recommended that you be designated to a Bureau of Prisons facility in close proximity to your family, which is commensurate with your security and custody classification needs. I will note that your family that you want to be placed near is in Colorado. It's my practice not to make recommendations for specific facilities.

It is recommended that you participate in the Bureau of Prisons 500-hour Comprehensive Residential Drug Abuse Treatment Program or an alternate substance abuse treatment program.

Upon release from imprisonment, you will be placed on supervised release for a term of 3 years. This term consists of 3 years on Count 2 and 3 years on Count 3 to be served concurrently.

Mr. Tindal, I did hear you when you were saying that the way to address this is to increase the term of supervised release. I can't do that. The statutes only allow me to impose a term of 3 years of supervised release. I can't impose more.

While on supervised release, you must comply with the following mandatory conditions: You must not commit

another federal, state, or local crime; you must not unlawfully use or posses a controlled substance; and you must cooperate in the collection of a DNA sample as directed by your probation officer.

In addition, you must comply with the standard conditions of supervision, which will be set out in my judgment order, and with all the special conditions of supervision set forth at paragraphs 96 through 103, 96 as modified by the Court earlier, in the presentence investigation report.

It is ordered that you must pay to the United States a special assessment of $200, which will be due immediately. It's also ordered that you pay a fine in the amount of $7,500. This is the bottom of the advisory guideline range on fine amount. Payment is due and payable immediately and must be paid -- be made payable to the United States Clerk of Court for the Northern District of Iowa.

If any of your court-ordered financial obligations are still owed while you are incarcerated, you must make monthly payments in accordance with the Bureau of Prisons Financial Responsibility Program. The amount of the monthly payments will not exceed 50 percent of the funds available to you through institution or noninstitution resources and will be at least $25 per quarter. If you

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

still owe any portion of the financial obligations at the time of release from imprisonment, you must pay it as a condition of supervision and the United States Probation Office will pursue collection of the amount due pursuant to a payment schedule approved by the Court. You must notify the United States Attorney for the Northern District of Iowa within 30 days of any change of your mailing address or -- mailing or residence address that occurs while any portion of the financial obligations remain unpaid. The interest requirement in this case is not waived.

It is ordered that you pay the costs of prosecution in the amount of $4,985.50.

You are hereby remanded to the custody of the United States Marshal.

Ms. Lundquist, there remains outstanding Counts 1 and 4.

MS. LUNDQUIST: Yes, we move for the dismissal.

THE COURT: The Court grants that motion and Counts 1 and 4 are dismissed.

Before I advise defendant of his limited rights to appeal, is there anything else on behalf of the United States?

MS. LUNDQUIST: No, Your Honor.

THE COURT: Officer VanderMolen?

PROBATION OFFICER: Yes, just one minor matter, Your Honor. Just for purposes of the judgment, does the Court want to specify how much departure you imposed in combination with how much upward variance?

THE COURT: They would be the same, so I'm departing up --

PROBATION OFFICER: Okay.

THE COURT: -- the same amount I would vary upward. So I'm clear on the record as well, if I am incorrect in my upward departure, I would vary to the same extent under the 3553(a) factors.

PROBATION OFFICER: Okay. Thank you, Your Honor.

THE COURT: Thank you, Officer.

And Mr. Tindal?

MR. TINDAL: Nothing further at this time, Your Honor.

THE COURT: Very good.

So, Mr. Stuber, let me talk to you, sir, about your rights to appeal. If you disagree with the sentence I've just imposed, you have the right to appeal that sentence to a higher court. That court is called the Eighth Circuit Court of Appeals. In your plea agreement you've reached with the government though, you've waived your right to appeal except under limited circumstances set

forth under that plea agreement. So the advice I'm about to give you now applies if you believe, under the terms of the plea agreement, you have the right to appeal. In order to appeal to the Eighth Circuit, you would have to file a written notice of appeal with the Clerk of Court for the Northern District of Iowa here in Cedar Rapids, Iowa, within the next 14 days. If you fail to file a written notice of appeal within the next 14 days, you give up forever your right to appeal the sentence I've just imposed. If you would like to appeal and you cannot afford the services of an attorney to do so, then I would appoint an attorney to represent you on appeal at no expense to you.

Do you understand your right to appeal, sir?

THE DEFENDANT: Yes.

THE COURT: Do you have any questions about anything we've done here today, sir?

THE DEFENDANT: No.

THE COURT: Mr. Tindal, anything further?

MR. TINDAL: Nothing further, Your Honor.

THE COURT: Ms. Lundquist?

MS. LUNDQUIST: No, Your Honor.

THE COURT: Thank you. That concludes the hearing.

(Proceedings concluded at 10:07 a.m.)

***Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.***

C E R T I F I C A T E

I, Patrice A. Murray, a Certified Shorthand Reporter of the State of Iowa, do hereby certify that at the time and place heretofore indicated, a hearing was held before the Honorable C.J. Williams; that I reported in shorthand and transcribed the proceedings of said hearing to the best of my ability; and that the foregoing transcript is a true record of all proceedings had on the taking of said hearing at the above time and place.

I further certify that I am not related to or employed by any of the parties to this action, and further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto or financially interested in the action.

IN WITNESS WHEREOF, I have set my hand this 5th day of June, 2020.

/s/ Patrice A. Murray

Patrice A. Murray, CSR, RPR, RMR, FCRR
United States District Court, NDIA
111 Seventh Avenue S.E.
Cedar Rapids, Iowa 52401-2101


Case 1:19-cr-00081-CJW-MAR Document 54 Filed 06/05/20 Page 67 of 79

## $

**$100** [1] - 4:5
**$106,000** [1] - 19:15
**$200** [2] - 4:6, 63:12
**$25** [1] - 63:25
**$250,000** [1] - 4:3
**$300,000** [1] - 48:3
**$4,985.50** [1] - 64:13
**$500,000** [1] - 4:4
**$7,500** [1] - 63:14

## '

**'18** [1] - 19:10

## /

**/s** [1] - 67:11

## 1

**1** [12] - 1:10, 2:8, 4:2, 11:13, 11:16, 11:19, 11:20, 12:12, 38:20, 43:23, 64:16, 64:20
**1-level** [1] - 31:12
**1.3** [1] - 40:21
**10** [8] - 2:8, 3:23, 11:16, 11:19, 11:20, 18:3, 31:22, 48:1
**103** [1] - 63:8
**10:07** [1] - 66:25
**11** [1] - 2:8
**111** [4] - 1:10, 1:17, 1:24, 67:13
**11CR3756** [1] - 61:23
**12** [8] - 2:12, 3:13, 17:22, 18:3, 30:17, 30:19, 32:1, 61:19
**13CR2585** [1] - 61:24
**14** [2] - 66:7, 66:8
**140S** [1] - 1:13
**15** [2] - 31:18, 32:3
**16** [1] - 53:25
**17** [1] - 60:4
**18** [6] - 3:18, 31:5, 43:24, 54:17, 60:12, 62:3
**18GS011728** [1] - 62:1
**19-CR-81** [2] - 1:5, 3:4

## 2

**2** [8] - 3:15, 18:14, 18:16, 23:2, 31:25, 61:18, 61:20, 62:17
**2)(E** [1] - 41:21
**2-level** [2] - 30:22, 31:7
**2-year** [1] - 58:19
**20** [1] - 43:2
**2011** [2] - 28:16, 47:7
**2013** [3] - 39:18, 47:6, 47:11
**2015** [2] - 18:8, 39:5
**2017** [4] - 16:4, 16:6, 28:15, 28:18
**2018** [11] - 10:18, 14:6, 14:22, 15:8, 17:11, 17:16, 23:19, 24:8, 24:11, 42:23, 54:25
**2018CR7237** [1] - 62:1
**2018M1085** [1] - 61:25
**2019** [7] - 3:13, 17:14, 21:13, 21:21, 27:3, 42:23, 54:25
**2020** [2] - 1:17, 67:10
**23** [1] - 2:4
**2322** [1] - 1:13
**24** [2] - 52:18, 53:6
**25th** [1] - 38:23
**26th** [4] - 14:6, 16:20, 24:11, 38:23
**286-2338** [1] - 1:25
**2A6.1** [2] - 43:22, 58:15
**2A6.1(a)(1)** [1] - 30:20
**2A6.1(b)(1** [2] - 4:16, 5:3
**2A6.1(b)(2)(A** [1] - 30:23
**2A6.1(b)(3** [2] - 4:16, 5:3
**2A6.1(b)(4** [4] - 5:7, 8:6, 8:16, 31:2

## 3

**3** [12] - 3:15, 3:25, 19:25, 31:17, 39:10, 48:14, 61:19, 62:16, 62:17, 62:22
**30** [1] - 64:7
**31** [2] - 55:18, 56:24
**319** [1] - 1:25
**32** [1] - 3:12
**33** [1] - 30:18
**34** [1] - 30:21
**35** [1] - 30:25
**3553(a** [6] - 43:15, 44:2, 44:3, 60:9, 60:12, 65:11
**3553(a)** [1] - 54:18
**3584** [1] - 62:3
**36** [1] - 11:15
**37** [5] - 11:22, 32:4, 32:8, 32:10
**3E1.1(a** [1] - 31:9
**3E1.1(b** [1] - 31:13

## 4

**4** [5] - 43:22, 45:19, 58:15, 64:17, 64:20
**4(B)** [1] - 59:1
**4-level** [2] - 8:7, 31:1
**40** [2] - 38:24, 44:14
**42** [1] - 6:16
**43** [1] - 4:14
**44** [1] - 31:21
**46** [2] - 32:9, 32:11
**4A1.1** [1] - 40:21
**4A1.3** [4] - 39:19, 41:21, 42:8, 59:4
**4th** [1] - 1:17

## 5

**5** [7] - 3:22, 4:2, 13:3, 15:14, 18:16, 20:12, 46:7
**5/12/20** [1] - 1:21
**50** [1] - 63:23
**500** [1] - 14:8
**500-hour** [1] - 62:12
**51** [3] - 43:24, 43:25, 48:15
**52401** [1] - 1:11
**52401-2101** [2] - 1:24, 67:13
**52807** [1] - 1:13
**53** [1] - 31:21
**55** [1] - 41:2
**58** [1] - 41:3
**59** [1] - 40:1
**5:30** [1] - 15:14
**5K2.13** [2] - 42:20, 58:2
**5th** [1] - 67:9

## 6

**6** [2] - 13:3, 20:18
**6/5/20** [1] - 1:21
**60** [2] - 40:1, 61:18
**63** [2] - 43:25, 48:15
**65** [1] - 59:25

## 7

**7** [4] - 18:24, 21:16, 25:23, 39:8
**72** [3] - 55:20, 55:22, 61:18
**73** [1] - 55:20
**77** [1] - 56:8

## 8

**8** [3] - 15:13, 22:4, 26:16
**81** [1] - 56:22
**86** [3] - 32:5, 32:8, 32:10
**875(c)** [1] - 3:19
**8:32** [1] - 1:18

## 9

**9** [1] - 2:3
**96** [4] - 5:24, 35:24, 63:8

## A

**a.m** [2] - 1:18, 66:25
**A.V** [1] - 35:25
**ability** [3] - 7:14, 47:25, 67:4
**able** [7] - 7:22, 24:6, 24:13, 26:4, 27:20, 36:7, 49:7
**absconded** [1] - 47:10
**absolutely** [1] - 59:14
**Abuse** [1] - 62:12
**abuse** [4] - 9:25, 40:2, 40:5, 62:13
**abused** [2] - 59:24
**abusive** [1] - 25:14
**Academy** [1] - 9:23
**acceptance** [2] - 31:8, 31:17
**accomplish** [2] - 33:24, 51:14
**accordance** [1] - 63:21
**accordingly** [1] - 48:12
**account** [11] - 12:21, 12:22, 15:4, 17:10, 36:15, 40:22, 41:14, 53:10, 54:19, 57:2, 60:11
**accurate** [1] - 5:21
**accusations** [2] - 41:4, 42:2
**achieve** [1] - 54:15
**acquired** [1] - 16:8
**acquiring** [1] - 36:17
**act** [3] - 6:7, 53:19, 54:3
**acting** [1] - 54:8
**action** [3] - 29:7, 67:7, 67:8
**activity** [1] - 48:14
**actual** [1] - 47:22
**Adams** [1] - 61:24
**added** [1] - 31:25
**addition** [1] - 63:5
**additional** [2] - 31:11, 31:25
**additionally** [1] - 42:7
**address** [14] - 18:24, 19:1, 24:16, 30:9, 34:25, 36:3, 36:9, 38:8, 40:17, 44:2, 44:11, 62:20, 64:8
**adequately** [1] - 59:16
**ADHD** [2] - 56:10, 60:2
**adjusted** [1] - 31:5
**administer** [1] - 17:8
**Administration** [1] - 56:22
**admission** [1] - 11:13
**adult** [2] - 41:19, 57:6
**advanced** [1] - 7:2
**advantaged** [1] - 49:24
**advice** [1] - 66:1
**advise** [2] - 50:3, 64:21
**advised** [2] - 15:21, 21:12
**advisory** [7] - 4:19, 5:23, 30:5, 30:14, 32:4, 43:22, 63:14
**affected** [1] - 56:5
**affects** [2] - 56:4, 56:6

**affirmed** [1] - 9:8
**afford** [1] - 66:11
**age** [3] - 51:10, 53:24, 60:4
**agent** [4] - 10:7, 18:23, 23:16, 54:23
**ages** [2] - 51:11
**aggravated** [1] - 50:25
**aggravating** [3] - 45:7, 45:25, 60:5
**ago** [1] - 43:2
**agree** [1] - 5:9
**agreement** [11] - 4:23, 4:24, 5:2, 5:19, 5:20, 8:4, 8:11, 8:19, 65:23, 66:1, 66:3
**aid** [1] - 56:2
**alarm** [1] - 14:14
**alarms** [1] - 10:23
**Albuquerque** [1] - 10:5
**alive** [1] - 26:18
**all-time** [1] - 56:25
**allegations** [3] - 40:25, 41:12, 47:18
**alleged** [2] - 6:2, 41:7
**allocution** [1] - 60:3
**allow** [2] - 34:13, 62:22
**allows** [1] - 41:13
**almost** [4] - 17:13, 43:10, 46:20, 47:4
**alone** [1] - 51:5
**alternate** [5] - 26:25, 27:14, 34:6, 34:7, 62:13
**alternative** [2] - 37:25, 38:2
**America** [1] - 3:3
**AMERICA** [1] - 1:3
**amount** [8] - 6:17, 43:19, 63:14, 63:15, 63:22, 64:4, 64:13, 65:8
**ample** [1] - 33:8
**AND** [2] - 1:10, 1:12
**Andrea** [1] - 3:8
**ANDREA** [1] - 1:12
**anger** [1] - 49:23
**angry** [2] - 49:11, 50:18
**Anita** [1] - 22:7
**answer** [2] - 7:22, 25:10
**anxiety** [1] - 15:24
**apologize** [3] - 32:10, 53:17, 54:10
**appeal** [12] - 64:22, 65:20, 65:21, 65:25, 66:3, 66:4, 66:5, 66:8, 66:9, 66:10, 66:12, 66:14
**Appeals** [1] - 65:23
**appear** [1] - 42:10
**appearance** [2] - 50:6, 50:7
**APPEARANCES** [1] - 1:9
**appeared** [4] - 1:11, 1:13, 24:2, 24:5
**application** [3] - 12:7, 58:15, 58:25
**applied** [1] - 4:15
**applies** [1] - 66:2
**apply** [1] - 59:5
**appoint** [3] - 17:8, 34:6, 66:12
**appointed** [1] - 49:9
**appreciate** [1] - 36:10
**appropriate** [9] - 6:15, 33:24, 34:18, 38:5, 58:14, 59:2, 59:22, 60:7, 60:14
**approved** [1] - 64:5
**April** [2] - 21:13, 39:10
**argue** [2] - 5:11, 51:21
**argued** [1] - 49:1
**arguing** [1] - 37:7
**argument** [2] - 30:9, 51:13
**arrest** [4] - 16:15, 16:25, 24:8, 42:14
**arrested** [2] - 17:14, 44:16
**arriving** [1] - 54:14
**Ashleey** [8] - 20:2, 22:2, 25:24, 32:18, 39:6, 45:23, 46:6, 47:8
**aspect** [1] - 51:16
**assault** [3] - 40:2, 47:8, 57:7
**assaulted** [1] - 57:14
**assaults** [1] - 47:23
**asserted** [1] - 6:18
**assessed** [3] - 30:18, 30:21, 30:25
**assessment** [2] - 4:5, 63:12
**assets** [1] - 48:3
**assigned** [3] - 9:19, 36:21, 62:2
**assistance** [2] - 10:14, 29:7
**Assistant** [1] - 3:6
**attached** [3] - 11:15, 29:3, 29:11
**attaching** [1] - 11:23
**attempted** [1] - 26:24
**attended** [5] - 9:23, 9:24, 10:2, 10:4, 10:5
**attorney** [6] - 34:3, 45:14, 49:6, 66:11, 66:12, 67:8
**Attorney** [1] - 64:6
**Attorney's** [1] - 1:10
**Attorneys** [2] - 3:6, 3:8
**ATTORNEYS** [2] - 1:10, 1:12
**attorneys** [3] - 7:19, 7:21, 8:5
**attributed** [1] - 14:10
**author** [1] - 3:11
**authorities** [1] - 35:20
**available** [1] - 63:24
**Avenue** [5] - 1:10, 1:17, 1:24, 14:9, 67:13
**avoid** [1] - 13:23
**awarded** [2] - 31:7, 43:23
**aware** [7] - 13:25, 16:14, 24:17, 25:14, 25:17, 26:9, 50:4


## B


**backgrounds** [1] - 46:23
**bad** [1] - 54:8
**balance** [2] - 33:24, 52:4
**balancing** [1] - 52:3
**bank** [68] - 6:7, 10:16, 10:20, 10:21, 10:25, 12:16, 12:19, 12:23, 13:10, 14:1, 14:13, 14:18, 14:20, 14:22, 14:24, 14:25, 15:9, 15:10, 15:13, 15:15, 15:20, 15:22, 15:25, 16:2, 16:3, 16:6, 16:18, 16:22, 17:3, 17:6, 17:12, 17:15, 24:12, 26:24, 27:4, 27:20, 27:22, 27:23, 28:5, 28:15, 28:17, 32:17, 32:21, 33:3, 33:5, 33:25, 34:8, 35:1, 35:8, 38:21, 38:24, 39:2, 44:7, 44:14, 44:18, 44:22, 44:25, 45:13, 48:1, 48:5, 50:10, 53:18, 55:2, 55:7, 58:24, 61:3
**Bank** [9] - 11:10, 12:14, 12:20, 14:8, 16:6, 16:8, 28:16, 35:11
**bank's** [3] - 27:10, 27:13, 34:6
**bar** [2] - 17:21, 33:4
**bargaining** [1] - 45:9
**barriers** [2] - 49:4
**base** [3] - 30:19, 43:24, 51:16
**based** [5] - 23:2, 32:23, 42:17, 46:16, 48:2
**bases** [4] - 38:15, 39:21, 43:21, 43:23
**basis** [1] - 32:24
**beat** [1] - 44:18
**became** [1] - 23:18
**become** [3] - 17:4, 34:9, 52:8
**BEFORE** [1] - 1:16
**begin** [2] - 10:12, 30:16
**beginning** [1] - 31:20
**behalf** [6] - 1:11, 1:13, 4:7, 8:5, 28:10, 64:22
**behavior** [2] - 42:16, 49:20
**behaviors** [3] - 49:18, 51:1, 53:3
**belief** [2] - 22:24, 23:4
**believes** [1] - 4:15
**belonged** [1] - 23:7
**belongs** [1] - 22:12
**beneficiary** [3] - 33:2, 33:5, 34:21
**benefit** [3] - 33:15, 37:4, 37:17
**best** [5] - 8:19, 37:4, 49:23, 53:2, 67:4
**better** [1] - 42:1
**between** [2] - 21:10, 42:3
**beyond** [1] - 46:15
**bill** [3] - 6:16, 6:17, 6:18
**bills** [1] - 45:14
**bipolar** [2] - 24:23, 53:19
**bit** [3] - 12:17, 16:10, 48:20
**black** [1] - 44:11
**Blairs** [2] - 19:1, 19:2
**blood** [2] - 22:15, 26:22
**bodily** [2] - 57:7, 57:16
**books** [1] - 33:16
**borne** [1] - 49:19
**bottom** [4] - 22:8, 22:9, 23:2, 63:14
**Box** [1] - 1:10
**brief** [2] - 6:21, 27:19
**briefed** [1] - 8:8
**briefly** [1] - 9:21
**bring** [1] - 27:21
**broke** [2] - 36:19, 47:14
**brought** [1] - 27:21
**bunched** [1] - 24:2
**burden** [1] - 32:13
**Bureau** [8] - 35:15, 35:17, 35:18, 51:23, 61:17, 62:4, 62:11, 63:21
**burglary** [1] - 9:24
**business** [3] - 18:22, 31:3, 45:11
**BY** [2] - 9:16, 23:15


## C


**C.J** [2] - 1:16, 67:3
**calculation** [4] - 4:19, 30:5, 30:14, 30:16
**California** [1] - 17:21
**call** [17] - 8:24, 9:4, 10:23, 11:2, 11:3, 14:3, 14:5, 14:14, 15:22, 16:22, 17:15, 29:23, 30:1, 44:15, 45:2, 45:18
**called** [6] - 9:8, 14:1, 14:6, 24:11, 44:13, 65:22
**caller** [1] - 14:9
**calling** [3] - 8:25, 9:1, 12:19
**calls** [22] - 9:5, 11:1, 12:18, 13:5, 13:10, 13:23, 16:9, 16:13, 17:12, 19:6, 24:22, 33:23, 35:4, 35:19, 37:7, 38:23, 38:24, 40:4, 44:7, 44:24, 47:14, 47:22
**camera** [1] - 39:15
**cancer** [2] - 22:5, 45:18
**cannot** [1] - 66:10
**capacity** [5] - 42:21, 42:23, 53:4, 58:2, 58:5
**car** [1] - 47:14
**care** [2] - 36:25, 50:15
**carefully** [1] - 54:20
**Carl** [7] - 3:3, 10:8, 17:24, 36:11, 51:5, 51:11
**CARL** [1] - 1:6
**carried** [2] - 57:13, 57:19




Case 1:19-cr-00081-CJW-MAR Document 54 Filed 06/05/20 Page 69 of 79

**carry** [4] - 5:4, 40:25, 41:15, 42:3
**Case** [1] - 3:4
**case** [26] - 4:9, 5:16, 5:20, 8:24, 10:7, 38:5, 38:9, 42:24, 43:6, 46:24, 47:9, 47:19, 48:5, 48:7, 52:14, 55:8, 55:9, 58:7, 58:25, 59:7, 60:14, 60:21, 61:23, 61:24, 61:25, 64:10
**cases** [4] - 31:25, 46:14, 50:20, 50:22
**category** [6] - 32:2, 32:3, 39:22, 43:24, 59:7, 59:16
**caused** [9] - 15:24, 45:15, 55:5, 55:6, 57:16, 58:22, 61:2, 61:3
**causing** [3] - 44:25, 57:7, 60:23
**Cedar** [19] - 1:11, 1:18, 1:24, 9:18, 10:14, 11:5, 11:10, 12:14, 12:19, 14:5, 14:8, 14:20, 16:7, 16:19, 24:9, 35:11, 45:1, 66:6, 67:13
**Center** [1] - 55:25
**center** [2] - 14:7, 15:22
**centers** [2] - 53:23, 60:3
**certain** [4] - 20:24, 28:13, 49:19
**certainly** [4] - 51:15, 51:22, 56:5, 59:11
**Certified** [2] - 1:19, 67:2
**certify** [2] - 67:2, 67:6
**change** [4] - 13:9, 13:20, 16:11, 64:7
**changed** [1] - 13:12
**changing** [1] - 13:18
**characteristics** [3] - 46:2, 46:19, 55:12
**charged** [3] - 3:15, 50:24, 61:9
**charges** [15] - 11:6, 11:7, 17:14, 24:8, 39:16, 39:24, 40:1, 40:13, 40:22, 40:23, 41:24, 46:7, 46:14, 47:18, 57:11
**checking** [1] - 27:20
**child** [1] - 40:2
**childhood** [3] - 59:23, 60:1, 60:4
**children** [6] - 20:6, 34:12, 34:14, 37:1, 55:3, 57:14
**chips** [1] - 45:9
**choking** [2] - 47:9, 57:15
**choose** [1] - 53:12
**chooses** [1] - 57:23
**chose** [1] - 46:25
**Chris** [1] - 13:7
**Circuit** [4] - 50:21, 50:23, 65:23, 66:4
**circumstances** [8] - 34:22, 42:24, 43:11, 44:5, 46:3, 54:21, 58:8, 65:25
**classification** [1] - 62:7
**clear** [2] - 42:5, 65:9
**clearly** [1] - 48:4
**Clerk** [2] - 63:17, 66:5
**client** [4] - 6:22, 51:5, 51:11, 52:21
**close** [5] - 15:14, 18:3, 37:15, 52:23, 62:5
**clothes** [1] - 15:5
**Code** [4] - 3:18, 54:17, 60:12, 62:3
**Coldwell** [1] - 18:21
**COLE** [1] - 1:10
**Cole** [1] - 3:7
**collaterally** [1] - 55:4
**collect** [1] - 11:9
**collection** [2] - 63:3, 64:4
**Colorado** [8] - 16:16, 20:24, 23:11, 52:22, 61:24, 61:25, 62:8
**Columbine** [2] - 10:24, 44:18
**Columbine-type** [1] - 10:24
**combination** [1] - 65:4
**comfortable** [3] - 9:11, 52:2, 52:20
**commencing** [1] - 1:18
**commensurate** [1] - 62:6
**comments** [1] - 54:19
**Commerce** [1] - 3:17
**commercial** [1] - 35:10
**commit** [3] - 10:24, 39:24, 62:25
**committed** [3] - 31:23, 47:8, 61:16
**communicate** [3] - 6:8, 24:6, 24:13
**communicated** [1] - 32:21
**communication** [11] - 3:17, 26:11, 33:4, 34:1, 34:14, 34:17, 34:24, 35:10, 35:14, 35:21, 58:21
**communications** [8] - 20:7, 23:23, 24:2, 38:12, 38:13, 38:18, 45:4, 58:17
**community** [4] - 52:9, 57:21, 60:17, 60:19
**competing** [2] - 43:14, 59:21
**complaints** [1] - 41:10
**Completed** [1] - 1:21
**comply** [2] - 62:24, 63:5
**Comprehensive** [1] - 62:12
**computers** [1] - 19:16
**concern** [4] - 14:22, 22:22, 41:22, 50:9
**concerned** [1] - 22:19
**concerning** [4] - 5:3, 7:10, 33:20, 34:14
**conclude** [1] - 48:9
**concluded** [1] - 66:25
**concludes** [1] - 66:23
**conclusion** [1] - 57:20
**concurrently** [1] - 62:18
**condition** [8] - 5:25, 30:7, 32:6, 32:13, 32:14, 32:24, 32:25, 64:3
**conditions** [6] - 35:15, 35:16, 49:22, 62:25, 63:6, 63:7
**conduct** [18] - 5:4, 8:7, 40:22, 41:20, 41:23, 42:14, 46:15, 47:1, 47:21, 56:5, 56:15, 57:9, 57:17, 57:18, 58:18, 59:10, 59:13, 61:12
**conferred** [1] - 29:15
**connection** [1] - 35:1
**consecutive** [2] - 61:19, 61:22
**consequences** [1] - 61:13
**consider** [1] - 40:19
**consideration** [3] - 6:7, 40:8, 40:14
**considered** [1] - 54:16
**consisted** [2] - 38:23, 43:10
**consistent** [3] - 49:12, 49:20, 50:2
**consistently** [1] - 50:11
**consists** [6] - 43:1, 44:6, 48:1, 55:22, 61:18, 62:17
**constantly** [2] - 18:4, 39:11
**contact** [20] - 6:2, 6:13, 15:16, 25:22, 25:25, 26:2, 26:5, 26:14, 32:25, 33:20, 33:21, 33:23, 34:13, 34:16, 34:19, 35:8, 45:24, 57:8
**contacted** [1] - 15:21
**contained** [1] - 12:16
**contains** [1] - 32:19
**contempt** [1] - 46:12
**contesting** [1] - 6:17
**continue** [3] - 6:9, 17:11, 50:15
**continued** [4] - 44:15, 45:24, 50:14, 51:9
**continues** [2] - 33:12, 59:13
**continuing** [3] - 6:7, 31:21, 53:2
**contributed** [2] - 43:6, 56:15
**contributing** [1] - 36:25
**control** [7] - 35:4, 35:6, 35:14, 49:23, 57:22, 57:23, 61:5
**controlled** [1] - 63:2
**conversation** [1] - 27:13
**conversations** [5] - 17:5, 27:3, 27:15, 27:17, 27:19
**convicted** [3] - 39:17, 47:15, 61:10
**conviction** [1] - 41:20
**convictions** [8] - 31:22, 40:4, 42:15, 47:4, 57:6, 57:9, 57:10
**cooperate** [1] - 63:3
**coordinator** [1] - 15:18
**copies** [1] - 12:13
**copy** [6] - 6:24, 7:2, 21:17, 22:17, 25:25, 29:10
**correct** [18] - 12:4, 13:2, 20:16, 20:19, 23:19, 23:24, 24:4, 24:14, 24:18, 25:12, 26:6, 26:14, 26:15, 26:19, 26:20, 26:22, 26:23, 28:23
**Correctional** [1] - 55:25
**correspondence** [2] - 6:25, 33:22
**corroboration** [1] - 25:18
**costs** [4] - 6:16, 6:17, 6:18, 64:12
**counsel** [3] - 29:15, 36:8, 67:8
**counselor** [3] - 15:16, 44:22, 58:23
**Count** [5] - 61:18, 61:19, 61:20, 62:17
**count** [5] - 3:14, 3:21, 4:4, 4:6, 57:5
**counterterrorism** [1] - 10:6
**country** [4] - 17:21, 21:7, 49:13, 49:15
**counts** [2] - 3:14, 3:21
**Counts** [3] - 3:15, 64:16, 64:20
**County** [7] - 7:3, 21:14, 55:25, 61:23, 61:24, 61:25, 62:1
**couple** [2] - 4:12, 6:2
**course** [3] - 13:8, 17:23, 35:19
**COURT** [53] - 1:1, 3:2, 4:11, 4:25, 5:13, 5:18, 5:22, 6:14, 6:20, 7:12, 7:17, 7:21, 7:25, 8:3, 8:14, 8:18, 8:22, 9:3, 9:10, 9:13, 11:14, 11:19, 11:21, 12:1, 12:3, 12:9, 23:13, 29:18, 29:20, 29:25, 30:3, 31:16, 32:10, 33:1, 33:10, 34:23, 36:5, 37:21, 40:17, 41:22, 48:18, 53:7, 54:13, 64:19, 64:25, 65:5, 65:8, 65:14, 65:18, 66:16, 66:19, 66:21, 66:23
**Court** [54] - 1:23, 3:3, 3:24, 4:1, 4:3, 4:4, 4:17, 29:1, 30:9, 30:11, 31:16, 32:8, 32:19, 32:24, 33:19, 33:21, 34:16, 36:1, 36:3, 36:9, 40:21, 41:1, 41:13, 41:24, 42:4, 42:18, 43:16, 43:25, 44:16, 46:16, 48:14, 48:24, 50:3, 51:2, 51:21, 52:1, 52:2, 52:10, 52:17, 52:19, 53:18, 56:3, 58:3, 59:5, 60:18, 61:15, 63:9, 63:17, 64:5, 64:19, 65:3, 65:23, 66:5, 67:12
**court** [14] - 3:1, 5:5, 20:23, 20:25, 27:10, 34:5, 34:12,



Case 1:19-cr-00081-CJW-MAR Document 54 Filed 06/05/20 Page 70 of 79

40:19, 46:14, 50:6, 50:7, 63:19, 65:22
**Court's** [2] - 40:8, 57:20
**court's** [1] - 3:12
**court-ordered** [1] - 63:19
**courtroom** [2] - 39:15, 46:10
**courts** [1] - 17:8
**crafted** [1] - 7:6
**crime** [2] - 3:20, 63:1
**crimes** [1] - 39:24
**Criminal** [1] - 3:4
**criminal** [29] - 31:19, 31:22, 31:24, 32:1, 32:2, 32:3, 39:20, 39:21, 39:23, 40:6, 40:9, 41:19, 41:20, 42:14, 47:3, 47:16, 47:21, 48:13, 52:13, 56:15, 57:4, 57:5, 57:17, 58:11, 59:5, 59:6, 59:8, 59:16, 59:17
**Crist** [2] - 16:19, 24:10
**cross** [1] - 23:13
**Cross** [1] - 2:4
**CROSS** [1] - 23:14
**cross-examination** [1] - 23:13
**CROSS-EXAMINATION** [1] - 23:14
**cry** [1] - 54:9
**CSR** [2] - 1:23, 67:12
**current** [2] - 24:16, 51:19
**custody** [3] - 61:16, 62:6, 64:14
**customer** [6] - 16:2, 16:3, 16:6, 28:14, 28:16, 28:21

## D

**D.G** [1] - 35:25
**dad** [2] - 44:9, 48:6
**damaged** [1] - 61:5
**danger** [2] - 57:21, 60:17
**Dara** [4] - 13:6, 22:2, 22:12, 32:18
**date** [4] - 16:5, 28:9, 42:25, 55:17
**dating** [1] - 43:2
**Davenport** [1] - 1:13
**days** [5] - 24:3, 44:14, 64:7, 66:7, 66:8
**dead** [2] - 45:22, 45:23
**deal** [1] - 17:9
**dealing** [1] - 15:23
**deals** [1] - 56:11
**death** [1] - 28:12
**decision** [1] - 8:18
**deemed** [1] - 8:24
**defendant** [123] - 3:7, 3:13, 3:24, 5:5, 5:22, 6:1, 6:16, 10:8, 10:22, 12:17, 12:18, 12:19, 13:1, 13:9, 14:1, 14:11, 14:23, 15:25, 16:2, 16:10, 16:12, 16:22, 16:23, 17:2, 17:11, 17:15, 18:7, 19:7, 19:10, 19:21, 20:4, 20:8, 20:10, 21:6, 21:11, 21:15, 21:21, 21:24, 22:12, 22:24, 23:7, 24:21, 25:16, 25:19, 26:3, 26:8, 26:13, 29:4, 29:25, 30:18, 31:1, 31:6, 31:11, 31:19, 31:23, 32:2, 32:17, 33:2, 33:4, 33:7, 34:19, 38:17, 39:12, 39:13, 41:8, 41:9, 42:13, 42:17, 43:2, 43:4, 43:13, 43:20, 44:13, 45:3, 46:6, 46:20, 47:21, 47:24, 48:3, 48:4, 48:9, 48:22, 48:25, 49:3, 49:21, 50:1, 50:4, 50:5, 50:6, 50:11, 51:1, 52:17, 55:1, 55:14, 55:17, 55:18, 55:21, 55:25, 56:3, 56:9, 56:12, 56:14, 56:16, 56:23, 57:1, 57:4, 57:6, 57:10, 57:12, 57:16, 57:20, 58:4, 58:16, 58:18, 59:11, 59:23, 60:17, 60:19, 61:2, 61:4, 61:9, 64:21
**Defendant** [2] - 1:7, 1:14
**DEFENDANT** [10] - 7:16, 7:20, 7:24, 8:2, 8:13, 8:17, 8:21, 53:16, 66:15, 66:18
**Defendant's** [1] - 49:3
**defendant's** [37] - 14:18, 17:24, 19:20, 20:6, 23:4, 23:8, 23:9, 28:11, 29:11, 31:18, 31:21, 35:1, 35:3, 35:14, 35:24, 36:12, 38:10, 42:9, 42:19, 43:1, 43:16, 44:5, 45:24, 46:1, 46:3, 46:15, 46:18, 48:1, 55:11, 55:13, 55:23, 58:1, 58:9, 58:11, 59:6, 59:17, 60:23
**defendants** [6] - 46:22, 49:9, 49:12, 49:21, 50:19, 50:23
**defense** [3] - 11:21, 29:15, 38:2
**DEFENSE** [1] - 2:11
**degree** [3] - 11:7, 41:14, 49:19
**DeKalb** [1] - 61:23
**demonstrated** [1] - 57:18
**Denver** [2] - 20:23, 61:25
**deny** [2] - 34:6, 43:16
**denying** [4] - 27:10, 58:1, 59:3, 59:18
**depart** [2] - 42:18, 48:14
**departing** [2] - 51:18, 65:6
**department** [3] - 14:1, 14:4, 14:11
**Department** [6] - 9:19, 10:14, 11:5, 14:5, 16:20, 45:1
**departure** [25] - 37:23, 37:24, 38:1, 38:9, 38:10, 38:15, 39:21, 40:20, 42:8, 42:19, 43:7, 43:19, 43:21, 58:2, 58:7, 58:14, 59:2, 59:4, 59:19, 60:8, 60:13, 65:3, 65:10
**departures** [3] - 5:11, 30:10, 37:23
**deplete** [1] - 36:15
**depression** [1] - 56:1
**describe** [2] - 9:21, 14:3
**described** [2] - 59:25, 60:1
**designated** [1] - 62:4
**designee** [1] - 17:8
**detainers** [1] - 42:11
**detective** [1] - 9:18
**deter** [2] - 48:13, 61:8
**determine** [1] - 28:5
**determined** [1] - 14:13
**determining** [2] - 40:19, 53:11
**deterred** [1] - 61:11
**deterrence** [1] - 48:7
**developed** [1] - 49:7
**diagnosed** [2] - 56:9, 60:2
**diagnoses** [2] - 25:7, 43:3
**diagnosis** [2] - 56:8, 56:10
**die** [1] - 44:19
**difference** [1] - 42:3
**different** [10] - 13:5, 13:14, 13:15, 15:11, 31:25, 39:1, 44:19, 50:5, 50:12, 50:16
**differently** [1] - 26:12
**difficult** [6] - 13:23, 34:5, 37:10, 44:20, 49:9, 49:12
**diminished** [1] - 58:2
**DIRECT** [1] - 9:15
**Direct** [1] - 2:3
**directed** [4] - 22:6, 38:18, 39:1, 63:4
**directly** [3] - 13:11, 32:21, 53:9
**disagree** [1] - 65:20
**discuss** [1] - 7:9
**discussed** [1] - 47:17
**discussing** [1] - 47:1
**discussion** [1] - 55:12
**discussions** [1] - 34:24
**disease** [1] - 56:4
**disguise** [1] - 13:21
**dismissal** [1] - 64:18
**dismissed** [3] - 26:6, 39:24, 64:20
**disorder** [2] - 53:19, 54:4
**dispatch** [1] - 14:7
**display** [1] - 49:10
**disposition** [2] - 30:11, 38:4
**dispute** [1] - 41:2
**disruption** [5] - 5:7, 8:8, 31:3, 55:5, 61:3
**distracted** [1] - 50:7
**distress** [4] - 55:7, 55:9, 58:23, 60:25
**distribute** [1] - 33:15
**DISTRICT** [2] - 1:1, 1:1
**District** [5] - 1:23, 63:18, 64:7, 66:6, 67:12
**disturbance** [1] - 40:3
**DNA** [1] - 63:3
**docket** [1] - 62:2
**document** [4] - 3:12, 6:16, 11:15, 11:22
**documentary** [1] - 34:15
**dog** [2] - 22:11, 22:15
**dog's** [1] - 22:16
**dogs** [4] - 22:25, 23:5, 26:17, 26:18
**domestic** [2] - 10:4, 40:5
**done** [2] - 60:14, 66:17
**down** [3] - 21:7, 29:21, 45:15
**downward** [7] - 38:1, 38:2, 42:19, 43:17, 58:2, 59:22, 60:7
**draft** [1] - 6:24
**drag** [1] - 45:19
**Drug** [1] - 62:12
**drugs** [1] - 56:1
**due** [4] - 57:25, 63:12, 63:15, 64:4
**duly** [1] - 9:8
**during** [7] - 13:8, 17:23, 19:3, 20:1, 38:24, 47:10, 54:24
**duty** [1] - 14:20

## E

**e-mail** [2] - 12:15, 27:18
**e-mails** [2] - 12:16, 35:5
**earned** [2] - 56:17, 56:23
**earnings** [1] - 46:20
**economy** [1] - 56:25
**education** [2] - 36:22, 54:1
**educational** [1] - 46:25
**effect** [3] - 16:23, 19:14, 21:19
**efforts** [3] - 8:9, 25:1, 27:14
**Eggleston** [1] - 22:7
**egregious** [2] - 45:25, 51:2
**eight** [4] - 14:12, 43:3, 55:18, 56:12
**Eighth** [3] - 50:21, 65:22, 66:4
**either** [3] - 15:1, 27:18, 51:8
**electronic** [1] - 33:22
**emergency** [1] - 14:7
**emotional** [3] - 35:4, 55:6, 58:22
**emotionally** [2] - 15:23, 37:8
**employed** [2] - 67:7, 67:8
**employee** [6] - 11:2, 11:3, 12:16, 15:2, 67:7
**employees** [17] - 10:23, 11:10, 12:14, 13:19, 15:22, 32:17, 32:22, 38:21, 39:2,

44:8, 44:17, 44:20, 44:23, 46:9, 55:2, 55:8, 58:24
**employment** [1] - 36:17
**end** [2] - 36:8, 49:13
**ended** [2] - 14:11, 14:20
**enforcement** [1] - 46:5
**engage** [1] - 47:1
**engaged** [3] - 8:7, 55:1, 58:16
**engaging** [3] - 42:14, 42:16, 61:11
**engine** [1] - 14:12
**Englewood** [2] - 52:22
**enhancement** [6] - 4:15, 5:6, 8:7, 8:16, 30:22, 31:1
**enhancements** [1] - 8:6
**enhancing** [1] - 51:18
**enjoys** [1] - 21:8
**entering** [1] - 31:12
**entirely** [2] - 28:17, 43:10
**entity** [1] - 35:10
**environment** [1] - 37:3
**ERIC** [1] - 1:12
**Eric** [1] - 3:9
**eroded** [1] - 49:15
**error** [1] - 60:8
**especially** [4] - 38:22, 43:5, 47:6, 50:21
**essentially** [8] - 4:14, 5:9, 28:20, 43:14, 46:21, 48:22, 49:1, 51:13
**establish** [1] - 32:13
**established** [3] - 28:8, 28:12, 52:8
**establishing** [1] - 41:25
**estate** [1] - 18:23
**estates** [1] - 34:5
**estranged** [3] - 18:2, 23:10, 36:12
**evidence** [11] - 32:19, 41:24, 42:22, 43:5, 43:8, 55:14, 56:2, 56:7, 57:24, 58:3, 58:6
**evidencing** [1] - 5:4
**exact** [2] - 16:5, 28:9
**EXAMINATION** [2] - 9:15, 23:14
**examination** [2] - 23:13, 29:18
**examined** [1] - 9:9
**example** [2] - 25:5, 25:19
**exceed** [1] - 63:23
**except** [1] - 65:25
**exception** [1] - 50:25
**excludes** [1] - 35:9
**excuse** [4] - 32:7, 46:2, 47:7, 56:24
**excused** [1] - 29:21
**exercised** [1] - 35:5
**exgirlfriend** [2] - 39:6, 45:22
**Exhibit** [24] - 2:12, 11:13, 11:23, 12:2, 12:12, 18:14, 18:16, 19:25, 20:12, 20:18, 21:16, 22:4, 25:23, 26:16, 29:4, 38:20, 39:8, 43:1, 45:19, 46:7, 48:1, 49:3, 56:11
**exhibited** [1] - 26:21
**EXHIBITS** [2] - 2:7, 2:11
**exhibits** [6] - 11:17, 28:25, 29:3, 29:8, 29:12, 54:24
**Exhibits** [3] - 2:8, 11:16, 11:20
**existed** [2] - 26:14, 56:18
**exists** [1] - 51:17
**expense** [1] - 66:13
**experience** [1] - 9:22
**explanation** [1] - 28:1
**explore** [1] - 25:7
**express** [1] - 22:22
**extend** [1] - 52:1
**extended** [1] - 46:15
**extent** [5] - 35:23, 56:18, 60:9, 65:11
**extradited** [1] - 16:16

## F

**F-ing** [1] - 45:20
**face** [2] - 24:14
**face-to-face** [1] - 24:14
**Facebook** [4] - 20:9, 21:2, 21:22, 39:13
**Facebooks** [1] - 35:5
**facilities** [1] - 62:10
**facility** [3] - 36:21, 52:24, 62:5
**fact** [10] - 6:6, 13:18, 16:14, 22:21, 22:25, 26:5, 40:16, 41:10, 55:15, 57:23
**factors** [10] - 43:15, 44:2, 44:3, 54:16, 60:5, 60:6, 60:10, 60:11, 65:11
**facts** [8] - 38:15, 41:6, 41:7, 41:25, 42:24, 43:11, 49:19, 58:8
**fail** [1] - 66:7
**failures** [1] - 42:10
**fair** [1] - 4:8
**fairly** [1] - 41:1
**false** [5] - 10:23, 14:13, 14:14, 45:2
**falsely** [1] - 44:24
**family** [5] - 40:5, 45:20, 55:3, 62:5, 62:7
**far** [3] - 28:19, 46:15, 53:1
**fashion** [1] - 34:16
**father** [14] - 17:24, 19:17, 19:20, 22:3, 24:21, 25:11, 25:14, 36:12, 39:3, 45:5, 45:6, 45:16, 51:7, 53:17
**father's** [2] - 45:10, 51:7
**FBI** [2] - 10:4, 10:14
**FBI's** [2] - 9:19, 15:18
**FCRR** [2] - 1:23, 67:12
**federal** [2] - 17:14, 63:1
**FedEx** [1] - 35:9
**feel** [2] - 7:17, 54:8
**feeling** [1] - 53:20
**feels** [2] - 52:2, 52:19
**felony** [1] - 40:2
**felt** [1] - 50:10
**Ferry** [1] - 19:2
**few** [2] - 24:3, 46:15
**fiancée** [8] - 18:18, 23:8, 37:9, 39:5, 44:10, 45:11, 45:18, 55:4
**file** [3] - 3:12, 66:5, 66:7
**filed** [16] - 3:12, 6:15, 11:6, 11:8, 11:14, 11:22, 12:3, 12:4, 12:6, 12:9, 18:8, 21:14, 21:17, 26:9, 27:5, 27:8
**filing** [1] - 12:6
**finally** [2] - 43:14, 47:24
**Financial** [1] - 63:22
**financial** [7] - 10:1, 47:25, 48:6, 56:21, 63:19, 64:1, 64:9
**financially** [1] - 67:8
**find** [11] - 34:5, 58:5, 58:8, 58:14, 59:2, 59:6, 59:15, 59:22, 60:5, 60:12, 60:16
**fine** [5] - 4:3, 23:17, 48:8, 63:13, 63:15
**fines** [1] - 36:13
**finger** [2] - 39:15, 46:11
**Fire** [2] - 14:5, 45:1
**fire** [6] - 10:23, 14:1, 14:3, 14:8, 14:11, 44:25
**firm** [1] - 61:4
**first** [15] - 9:8, 11:7, 16:7, 22:4, 22:9, 23:18, 32:14, 38:6, 38:7, 40:18, 50:6, 53:16, 54:21, 60:14
**First** [1] - 14:8
**first-degree** [1] - 11:7
**five** [1] - 13:15
**flashing** [2] - 39:15, 46:11
**focus** [2] - 50:8, 51:21
**focusing** [1] - 51:20
**follow** [2] - 25:18, 50:14
**follow-up** [1] - 25:18
**followed** [1] - 49:18
**following** [3] - 3:1, 3:20, 62:25
**follows** [2] - 9:9, 51:25
**followthrough** [1] - 14:23
**FOR** [1] - 1:1
**Force** [2] - 9:20, 10:3
**foregoing** [1] - 67:4
**Forest** [1] - 19:2
**forever** [1] - 66:9
**formal** [1] - 25:7
**former** [2] - 20:5, 45:14
**Forsyth** [2] - 21:14, 62:1
**forth** [6] - 30:5, 35:5, 54:17, 60:11, 63:8, 66:1
**forwarded** [1] - 15:1
**founded** [1] - 52:9
**four** [6] - 3:14, 38:14, 42:11, 43:20, 57:8, 57:9
**Four** [1] - 29:6
**four-count** [1] - 3:14
**frankly** [1] - 51:10
**frequently** [4] - 13:12, 22:22, 34:11, 45:7
**front** [3] - 55:16, 57:24, 58:6
**fugitive** [1] - 39:25
**full** [2] - 4:8, 56:20
**full-time** [1] - 56:20
**function** [1] - 54:4
**functions** [2] - 5:7, 31:3
**funds** [3] - 33:15, 33:17, 63:23

## G

**Gale** [1] - 15:17
**gaps** [1] - 49:18
**GED** [2] - 7:13, 56:17
**general** [1] - 21:5
**generally** [2] - 7:11, 19:12
**Georgia** [8] - 18:9, 21:8, 21:14, 23:11, 25:24, 39:10, 61:23, 62:1
**get** [15] - 7:18, 19:15, 22:5, 36:21, 37:12, 39:4, 44:6, 44:12, 45:18, 53:24, 53:25, 54:5, 54:11
**getting** [4] - 13:5, 37:1, 49:10, 49:11
**Gibbs** [6] - 22:3, 22:12, 23:8, 23:9, 32:18, 32:20
**Gibbs's** [1] - 13:6
**girlfriend** [1] - 20:5
**give** [5] - 42:1, 44:23, 51:4, 66:2, 66:9
**given** [2] - 28:1, 51:7
**gives** [1] - 50:17
**goal** [1] - 48:7
**goals** [3] - 51:15, 54:16, 60:18
**God** [1] - 49:5
**GOVERNMENT** [1] - 2:7
**government** [20] - 4:12, 4:15, 4:18, 5:2, 6:15, 6:18, 8:15, 8:20, 8:23, 11:14, 29:22, 37:25, 43:16, 43:22, 47:25, 50:3, 51:4, 55:16, 60:16, 65:24
**Government** [3] - 12:12, 38:20, 39:8
**Government's** [2] - 25:23, 26:16
**government's** [13] - 8:9, 31:10, 32:13, 38:8, 42:7, 43:18, 48:21, 49:1, 51:13,

58:13, 59:3, 59:19
**governmental** [1] - 31:3
**grabbing** [1] - 57:15
**grace** [1] - 49:4
**grandmother** [1] - 28:11
**grant** [1] - 31:16
**grants** [1] - 64:19
**greater** [1] - 54:15
**ground** [1] - 59:20
**grounds** [1] - 51:17
**group** [1] - 30:16
**grouped** [1] - 30:15
**Guaranty** [3] - 16:6, 16:8, 28:16
**guess** [2] - 6:10, 48:20
**guideline** [8] - 5:9, 5:23, 8:10, 30:10, 32:4, 44:4, 48:8, 63:15
**guidelines** [9] - 4:12, 4:19, 4:24, 30:5, 30:15, 30:16, 31:9, 38:9, 51:19
**guilty** [4] - 3:13, 3:15, 31:6, 31:12

## H

**hair** [1] - 45:20
**hand** [3] - 22:16, 35:2, 67:9
**happen** [1] - 27:2
**happened** [2] - 10:19, 17:17
**happening** [2] - 20:22, 22:13
**happens** [1] - 35:17
**harassing** [4] - 18:4, 38:13, 38:25, 40:4
**harassment** [3] - 11:7, 58:20, 61:1
**harassments** [1] - 37:6
**hard** [1] - 15:23
**harm** [2] - 14:24, 44:10
**heal** [1] - 51:12
**health** [14] - 36:22, 49:14, 49:24, 50:15, 51:22, 52:7, 52:14, 52:24, 52:25, 53:22, 55:13, 55:15, 55:21, 57:25
**healthcare** [1] - 49:24
**healthy** [1] - 26:19
**hear** [9] - 4:25, 30:8, 30:9, 30:12, 32:14, 36:5, 37:22, 38:6, 62:19
**heard** [5] - 5:18, 8:3, 25:16, 36:7, 41:24
**hearing** [8] - 3:5, 28:24, 53:8, 54:25, 66:24, 67:3, 67:4, 67:5
**HEARING** [1] - 1:15
**Hedges** [1] - 18:22
**HELD** [1] - 1:16
**held** [2] - 3:1, 67:3
**help** [3] - 37:12, 54:9, 54:11
**hereby** [3] - 61:16, 64:14, 67:2
**hereto** [1] - 67:8
**heretofore** [1] - 67:3
**high** [1] - 56:9
**higher** [1] - 65:22
**highly** [1] - 42:17
**himself** [3] - 24:21, 37:17, 46:10
**hire** [1] - 44:22
**hiring** [1] - 14:20
**history** [30] - 21:10, 24:17, 31:19, 31:22, 32:1, 32:2, 32:3, 39:20, 39:21, 39:23, 40:9, 42:9, 46:1, 46:18, 46:20, 47:3, 51:9, 53:19, 53:22, 55:11, 56:16, 56:17, 57:4, 57:5, 58:11, 59:5, 59:6, 59:8, 59:16, 59:17
**hit** [1] - 56:25
**hold** [1] - 53:13
**holding** [1] - 22:16
**holds** [2] - 34:20, 45:13
**home** [1] - 37:15
**homeless** [2] - 24:15, 36:19
**homicide** [1] - 9:25
**HON** [1] - 1:16
**Honor** [44] - 4:10, 4:22, 5:17, 5:21, 6:4, 6:19, 6:23, 7:16, 7:20, 8:13, 8:21, 9:2, 11:12, 11:18, 11:25, 12:11, 23:12, 29:17, 29:19, 29:24, 30:2, 31:15, 32:7, 32:16, 33:7, 33:11, 34:11, 34:22, 36:4, 36:11, 38:7, 40:7, 41:18, 42:6, 48:17, 52:16, 52:21, 53:5, 64:24, 65:2, 65:13, 65:17, 66:20, 66:22
**Honorable** [1] - 67:3
**hope** [4] - 21:6, 37:12, 51:4, 51:8
**hopefully** [2] - 51:9, 51:12
**hopes** [3] - 21:6, 21:8, 36:15
**hoping** [3] - 36:13, 36:20, 37:16
**hour** [1] - 7:4
**hours** [2] - 15:14, 56:19
**hundred** [1] - 20:24

## I

**Ill** [3] - 17:24, 36:10, 36:11
**illness** [7] - 24:18, 24:23, 25:2, 49:8, 56:4, 56:14, 56:15
**imagine** [1] - 33:3
**immediate** [1] - 50:9
**immediately** [2] - 63:13, 63:16
**impairment** [1] - 43:5
**important** [2] - 36:6, 48:4
**importantly** [1] - 51:2
**impose** [14] - 4:2, 4:3, 4:5, 30:12, 32:24, 35:16, 43:25, 48:15, 60:15, 60:18, 60:20, 61:8, 62:22, 62:23
**imposed** [4] - 61:23, 65:3, 65:21, 66:10
**impoverished** [1] - 46:22
**imprisoned** [1] - 61:17
**imprisonment** [5] - 32:4, 61:21, 61:22, 62:15, 64:2
**IN** [2] - 1:1, 67:9
**in-person** [1] - 33:23
**inability** [2] - 49:23, 57:25
**inappropriate** [2] - 35:21, 43:7
**incapable** [1] - 52:11
**incarcerate** [1] - 43:12
**incarcerated** [7] - 33:14, 33:18, 50:1, 54:7, 56:6, 61:10, 63:20
**incarceration** [6] - 49:25, 51:20, 52:4, 52:11, 53:1, 58:12
**incident** [1] - 41:4
**include** [1] - 29:3
**including** [4] - 55:2, 55:3, 55:4
**inclusion** [1] - 35:25
**income** [1] - 28:5
**incorporated** [1] - 51:16
**incorrect** [1] - 65:10
**increase** [2] - 8:9, 62:20
**increasing** [2] - 52:3, 52:4
**independent** [1] - 25:17
**INDEX** [1] - 2:1
**indicate** [3] - 41:4, 43:12, 58:9
**indicated** [2] - 25:11, 67:3
**indicates** [2] - 56:8, 58:11
**indicating** [2] - 7:1, 55:25
**indictment** [1] - 3:14
**individually** [1] - 7:5
**individuals** [1] - 34:11
**industries** [1] - 56:21
**inflicting** [1] - 55:9
**information** [6] - 15:16, 25:17, 40:19, 55:20, 56:13, 56:19
**ing** [1] - 45:20
**injuries** [2] - 57:17, 61:2
**injury** [3] - 57:7, 57:16, 60:25
**instance** [6] - 4:17, 13:5, 17:15, 18:13, 19:9, 57:13
**instant** [2] - 31:23, 61:21
**instead** [2] - 47:2, 54:11
**institution** [1] - 63:24
**insurance** [1] - 48:2
**intent** [2] - 5:4, 8:23
**interest** [2] - 8:19, 64:10
**interested** [1] - 67:8
**interfering** [1] - 19:17
**Interstate** [1] - 3:17
**intervention** [1] - 58:23
**interview** [2] - 24:7, 24:10
**investigate** [1] - 25:2
**investigation** [23] - 3:11, 4:9, 6:24, 7:7, 10:7, 10:12, 10:15, 13:8, 13:12, 14:17, 17:23, 19:4, 20:1, 22:21, 23:19, 23:21, 26:13, 30:6, 30:17, 42:13, 45:21, 55:19, 63:10
**investigations** [5] - 9:25, 10:1, 10:6
**involved** [9] - 10:15, 23:18, 30:23, 38:11, 43:9, 57:7, 58:10, 58:20, 58:24
**IOWA** [1] - 1:1
**Iowa** [15] - 1:11, 1:13, 1:18, 1:24, 9:23, 13:22, 17:1, 17:7, 34:3, 63:18, 64:7, 66:6, 66:7, 67:2, 67:13
**issue** [3] - 33:6, 33:8, 50:9
**issues** [4] - 34:10, 38:3, 52:15, 58:1
**itself** [3] - 34:25, 35:13, 51:12
**IV** [1] - 1:6

## J

**jail** [1] - 6:25
**Jail** [1] - 7:3
**January** [1] - 19:10
**job** [2] - 36:24, 37:3
**John** [3] - 2:3, 9:5, 9:12
**JOHN** [1] - 9:7
**Joint** [2] - 9:19, 10:2
**judges** [1] - 46:7
**judgment** [3] - 61:15, 63:7, 65:2
**judicial** [1] - 49:13
**June** [6] - 17:14, 19:20, 21:21, 44:15, 45:22, 67:10
**justice** [3] - 31:24, 39:25, 52:13
**juvenile** [1] - 29:7

## K

**Karen** [1] - 15:17
**Kathy** [1] - 18:18
**Keegan** [1] - 1:12
**keep** [1] - 51:13
**ketchup** [1] - 26:22
**key** [2] - 48:24
**kid** [1] - 49:2
**kids** [2] - 21:8, 37:18
**kill** [10] - 10:22, 22:2, 22:3, 44:6, 44:8, 44:10, 44:18, 45:6, 45:9, 45:17
**killed** [3] - 17:22, 22:25, 23:4
**Kimberly** [1] - 1:13
**kind** [2] - 49:10, 52:12

**knife** [1] - 22:16
**knowledge** [5] - 15:19, 17:3, 18:20, 26:8, 26:14
**known** [1] - 57:1
**knows** [2] - 48:24, 52:25
**Kyndra** [1] - 3:6
**KYNDRA** [1] - 1:10

## L

**lack** [4] - 26:6, 35:4, 46:5, 46:23
**Langenberg** [2] - 18:19, 19:3
**large** [2] - 24:15, 50:20
**largely** [2] - 42:24, 56:20
**law** [7] - 40:16, 41:13, 46:5, 46:6, 48:10, 59:14, 61:3
**lawyers** [1] - 8:3
**lead** [1] - 5:15
**learn** [3] - 28:8, 36:22, 37:14
**learned** [3] - 13:11, 26:18, 54:4
**least** [10] - 7:8, 13:15, 14:12, 16:4, 16:6, 28:16, 33:25, 50:22, 57:13, 63:25
**leaves** [1] - 31:5
**legal** [1] - 13:16
**less** [3] - 51:1, 52:18, 53:6
**level** [8] - 30:19, 31:5, 31:15, 31:18, 32:3, 43:23, 43:24, 52:3
**levels** [2] - 31:17, 48:15
**levied** [1] - 36:14
**life** [10] - 37:2, 37:12, 45:13, 46:21, 48:2, 48:11, 50:17, 53:23, 54:1, 54:8
**lights** [2] - 14:15, 45:1
**likelihood** [5] - 39:23, 59:8, 59:10, 59:15, 59:18
**likely** [3] - 41:8, 42:17, 59:11
**limit** [2] - 33:21, 35:8
**limitation** [1] - 40:18
**limited** [4] - 34:17, 55:20, 64:21, 65:25
**limiting** [1] - 34:23
**line** [1] - 15:1
**lines** [3] - 10:16, 14:24, 36:20
**Linn** [2] - 7:3, 55:24
**list** [1] - 35:25
**live** [1] - 37:18
**livelihood** [1] - 57:3
**lives** [4] - 32:20, 37:18, 45:9, 55:6
**living** [2] - 23:10, 37:6
**loan** [2] - 15:3, 17:6
**local** [1] - 63:1
**lock** [1] - 48:23
**locked** [2] - 45:15, 51:14
**look** [2] - 13:21, 28:4
**looking** [9] - 17:6, 27:24, 38:20, 39:7, 44:4, 44:13, 45:20, 46:1, 46:6
**looks** [4] - 38:22, 46:21, 48:2, 56:20
**low** [1] - 56:25
**LUNDQUIST** [24] - 1:10, 4:10, 4:21, 5:1, 9:1, 9:5, 9:16, 11:12, 11:25, 12:11, 23:12, 29:19, 29:24, 31:14, 32:16, 33:7, 36:4, 38:7, 40:10, 41:18, 42:6, 64:18, 64:24, 66:22
**Lundquist** [15] - 2:3, 3:7, 4:7, 5:14, 5:18, 8:23, 29:9, 31:10, 32:14, 33:1, 36:2, 38:6, 41:22, 64:16, 66:21

## M

**machine** [1] - 1:20
**made** [13] - 11:4, 13:1, 13:23, 13:25, 16:21, 38:17, 38:19, 38:25, 44:20, 45:14, 53:17, 58:18, 63:16
**mail** [5] - 12:15, 27:18, 35:9, 35:12, 35:19
**mailing** [2] - 64:8
**mails** [2] - 12:16, 35:5
**maintain** [4] - 6:12, 8:15, 33:17, 52:6
**maintaining** [2] - 6:1, 50:16
**make** [16] - 6:21, 8:15, 13:18, 13:21, 16:12, 16:17, 16:23, 17:12, 17:16, 24:22, 25:1, 37:13, 44:1, 50:22, 62:9, 63:20
**makes** [3] - 39:19, 40:12, 57:12
**making** [5] - 15:25, 16:10, 38:13, 55:8, 58:20
**male** [1] - 14:9
**managing** [2] - 28:6, 53:3
**Manchester** [1] - 11:3
**mandatory** [2] - 4:5, 62:25
**manic** [2] - 49:10, 53:20
**manner** [2] - 44:22, 57:15
**marked** [1] - 25:23
**Marshal** [1] - 64:15
**MASON** [1] - 1:12
**Mason** [2] - 1:13, 3:8
**MATIAS** [1] - 9:7
**Matias** [4] - 2:3, 9:6, 9:12, 23:18
**Matt** [1] - 3:7
**matter** [5] - 3:2, 3:4, 40:15, 40:16, 65:1
**matters** [3] - 6:9, 7:10, 34:1
**MATTHEW** [1] - 1:10
**maximum** [1] - 3:23
**mean** [1] - 53:22
**means** [1] - 46:24
**measures** [1] - 14:18
**medical** [5] - 25:4, 43:1, 46:25, 55:23, 56:10
**medicated** [1] - 50:11
**medication** [2] - 50:2, 53:2
**medications** [2] - 50:17, 52:7
**meets** [1] - 43:20
**members** [1] - 55:3
**memorandum** [3] - 11:15, 11:22, 29:11
**menacing** [1] - 40:2
**mental** [30] - 24:17, 24:22, 25:2, 36:21, 42:21, 42:23, 43:5, 49:8, 49:14, 49:24, 50:15, 51:22, 52:7, 52:14, 52:24, 52:25, 53:22, 55:9, 55:13, 55:15, 55:21, 56:4, 56:14, 56:15, 57:17, 57:25, 58:5, 58:22, 60:24
**mentally** [1] - 54:8
**mention** [2] - 19:18, 54:18
**mentioned** [9] - 15:5, 16:2, 23:7, 25:22, 44:13, 45:4, 47:3, 58:22, 60:3
**merit** [1] - 40:14
**message** [5] - 19:13, 20:9, 20:13, 21:3, 46:6
**messages** [17] - 18:5, 18:11, 19:6, 19:21, 19:23, 21:10, 21:22, 21:25, 22:17, 23:2, 26:17, 39:11, 39:13, 44:9, 45:22, 45:24, 46:4
**met** [5] - 7:3, 7:21, 46:25, 50:5, 50:6
**Mexico** [1] - 10:6
**microphone** [1] - 36:8
**middle** [1] - 18:24
**might** [2] - 26:10, 43:5
**minor** [1] - 65:1
**mitigating** [2] - 60:5, 60:6
**modification** [1] - 6:10
**modified** [1] - 63:9
**money** [10] - 6:17, 12:22, 33:16, 36:19, 44:7, 44:9, 48:4, 48:6, 56:23
**monitoring** [2] - 35:19, 53:3
**monthly** [2] - 63:21, 63:23
**months** [12] - 21:20, 32:5, 32:11, 44:15, 48:15, 50:12, 52:18, 53:6, 61:18, 61:19
**moreover** [1] - 43:7
**morning** [3] - 4:22, 15:13, 36:11
**most** [4] - 10:1, 41:8, 51:2, 59:10
**mother** [12] - 20:6, 21:22, 22:1, 22:7, 24:24, 25:4, 25:20, 45:17, 47:12, 55:3, 57:14, 60:1
**mother's** [1] - 23:4
**motion** [13] - 31:16, 38:1, 38:8, 39:19, 42:8, 42:20, 43:16, 43:18, 58:1, 58:13, 59:3, 59:19, 64:19
**motions** [3] - 37:24, 43:15, 59:21
**move** [3] - 11:13, 17:3, 64:18
**moved** [1] - 43:24
**moves** [2] - 21:7, 31:14
**moving** [3] - 42:19, 43:14, 45:3
**MR** [18] - 5:17, 5:21, 6:4, 6:19, 6:23, 11:18, 12:6, 23:15, 29:16, 30:2, 32:7, 33:11, 36:10, 40:7, 40:15, 48:20, 65:16, 66:20
**MS** [23] - 4:10, 4:21, 5:1, 9:1, 9:5, 9:16, 11:12, 11:25, 12:11, 23:12, 29:19, 29:24, 31:14, 32:16, 33:7, 36:4, 38:7, 40:10, 41:18, 42:6, 64:18, 64:24, 66:22
**multiple** [4] - 38:14, 53:23, 58:24, 59:13
**multitude** [1] - 47:13
**Murray** [5] - 1:19, 1:23, 67:2, 67:11, 67:12
**music** [1] - 17:21
**must** [14] - 4:4, 35:11, 35:12, 61:6, 62:24, 62:25, 63:1, 63:3, 63:5, 63:11, 63:16, 63:20, 64:2, 64:5

## N

**name** [3] - 9:11, 15:17, 26:25
**narratives** [1] - 41:3
**narrow** [1] - 34:17
**Nathan** [1] - 3:10
**nature** [4] - 44:4, 45:24, 46:3, 54:21
**NDIA** [1] - 67:12
**near** [1] - 62:8
**necessarily** [1] - 33:12
**necessary** [2] - 48:13, 54:15
**neck** [1] - 22:16
**need** [9] - 7:1, 29:7, 34:2, 43:11, 43:12, 57:3, 58:9, 58:11, 61:8
**needing** [1] - 58:23
**needs** [7] - 6:6, 34:15, 46:24, 52:25, 61:12, 62:7
**nervous** [2] - 53:17, 55:9
**never** [1] - 54:4
**nevertheless** [1] - 41:13
**new** [2] - 15:3, 44:4
**New** [1] - 10:5
**news** [1] - 17:17
**next** [3] - 22:16, 66:7, 66:8
**nine** [4] - 42:12, 43:3, 55:18, 56:12
**no-contact** [11] - 6:2, 6:13, 25:22, 25:25, 26:2, 26:5,

26:14, 32:25, 34:13, 34:16, 57:8
**nominate** [1] - 27:14
**none** [2] - 42:15, 61:10
**noninstitution** [1] - 63:24
**Northeast** [1] - 14:9
**NORTHERN** [1] - 1:1
**Northern** [3] - 63:17, 64:6, 66:6
**notations** [1] - 40:13
**note** [11] - 40:10, 42:8, 43:17, 43:21, 43:22, 46:4, 47:18, 47:24, 58:15, 58:25, 62:7
**noted** [6] - 4:13, 8:23, 39:25, 43:21, 55:16, 60:22
**notes** [3] - 38:22, 40:12, 41:19
**nothing** [7] - 23:12, 26:12, 29:16, 40:25, 46:9, 65:16, 66:20
**notice** [2] - 66:5, 66:8
**notify** [1] - 64:6
**November** [4] - 3:13, 14:22, 15:8, 17:16
**Number** [1] - 3:4
**number** [27] - 3:12, 6:16, 11:15, 11:22, 13:6, 13:7, 13:9, 13:13, 13:21, 13:22, 14:10, 14:25, 16:11, 32:22, 34:4, 38:25, 39:1, 39:3, 39:11, 50:12, 55:6, 55:10, 58:15, 59:1, 61:24, 62:2
**numbers** [7] - 13:5, 13:14, 13:16, 13:19, 44:19, 61:23, 61:25
**numerous** [4] - 9:24, 10:21, 24:3, 55:1

## O

**o'clock** [1] - 15:13
**Oaks** [1] - 29:6
**object** [4] - 34:18, 40:8, 41:8, 41:9
**objected** [2] - 8:5, 35:24
**objecting** [2] - 40:15, 40:16
**objection** [14] - 4:13, 5:2, 5:6, 5:24, 6:1, 6:5, 6:11, 6:12, 8:15, 11:16, 11:23, 35:24, 36:1, 40:17
**objections** [8] - 4:12, 4:18, 4:21, 5:3, 5:23, 7:6, 35:23, 40:11
**obligations** [4] - 33:14, 63:19, 64:1, 64:9
**obsessions** [1] - 49:11
**obsessive** [4] - 49:11, 49:17, 49:22, 50:18
**obstruction** [1] - 39:25
**obtain** [1] - 25:25
**obviously** [3] - 48:24, 51:8, 52:10
**occasion** [1] - 13:20
**occasions** [1] - 39:6
**occurred** [4] - 17:13, 17:21, 57:9, 57:10
**occurring** [1] - 10:16
**occurs** [1] - 64:9
**October** [10] - 10:18, 14:6, 16:10, 16:20, 17:11, 23:19, 24:7, 24:11, 38:23, 44:14
**OF** [2] - 1:1, 1:3
**off-duty** [1] - 14:20
**offense** [26] - 3:16, 30:19, 30:23, 31:2, 31:5, 31:18, 31:23, 32:3, 32:19, 38:11, 42:11, 43:6, 43:9, 43:10, 43:24, 44:5, 50:24, 51:16, 54:22, 58:9, 60:6, 60:21, 60:22, 61:7, 61:21
**offenses** [4] - 10:10, 30:15, 31:6, 58:5
**offered** [3] - 34:7, 39:9, 54:24
**office** [9] - 5:10, 19:1, 30:21, 30:25, 31:7, 31:20, 40:12, 45:15
**Office** [2] - 1:10, 64:4
**officer** [16] - 15:3, 15:5, 15:9, 15:11, 15:21, 16:18, 17:6, 23:16, 23:17, 23:18, 24:10, 33:9, 36:24, 49:16, 52:7, 63:4
**OFFICER** [3] - 65:1, 65:7, 65:12
**Officer** [6] - 3:10, 16:19, 24:10, 29:20, 64:25, 65:14
**officers** [3] - 14:21, 24:7, 46:13
**often** [3] - 13:9, 34:14, 49:8
**old** [5] - 43:3, 55:18, 55:19, 56:12, 56:24
**older** [2] - 54:5, 54:6
**one** [22] - 8:6, 9:1, 13:20, 15:15, 17:1, 18:6, 18:8, 21:14, 24:4, 24:13, 25:23, 27:15, 27:23, 34:12, 39:13, 47:9, 56:1, 57:6, 57:13, 60:17, 65:1
**ongoing** [3] - 6:12, 34:1, 55:21
**open** [1] - 3:1
**opened** [1] - 15:10
**opening** [1] - 15:12
**opportunity** [6] - 4:8, 7:9, 37:13, 46:23, 51:6, 53:9
**oppose** [1] - 8:8
**opposed** [2] - 26:22, 33:22
**option** [2] - 4:1, 34:8
**order** [24] - 4:17, 5:5, 6:2, 6:13, 18:6, 21:13, 21:17, 25:22, 25:25, 26:3, 26:5, 26:14, 27:10, 34:16, 39:4, 39:9, 40:3, 40:5, 46:8, 47:7, 47:11, 47:13, 63:7, 66:4
**ordered** [5] - 61:20, 63:11, 63:13, 63:19, 64:12
**Ordered** [1] - 1:21
**ordering** [1] - 52:20
**orders** [5] - 16:12, 34:13, 42:15, 46:13, 57:8
**original** [1] - 16:21
**originally** [2] - 12:15, 27:23
**outright** [1] - 6:11
**outstanding** [2] - 16:25, 64:16
**outweigh** [1] - 60:6
**overall** [1] - 47:20
**overboard** [1] - 53:21
**overrules** [1] - 36:1
**overruling** [1] - 35:22
**owe** [1] - 64:1
**owed** [2] - 19:15, 63:20
**own** [2] - 7:15, 33:17

## P

**Page** [1] - 2:3
**page** [9] - 7:5, 18:16, 18:24, 22:9, 23:2, 30:17, 38:22, 39:10
**pages** [2] - 13:3, 13:4
**paid** [2] - 46:21, 63:16
**pain** [1] - 54:6
**pandemic** [1] - 56:24
**paperwork** [2] - 27:5, 27:7
**paragraph** [17] - 4:13, 4:14, 5:24, 7:5, 30:18, 30:21, 30:25, 31:20, 31:21, 35:24, 45:21, 55:22, 55:24, 56:8, 56:22, 59:25
**paragraphs** [5] - 40:1, 41:2, 55:20, 63:8
**paranoia** [1] - 15:24
**parole** [2] - 3:22, 36:24
**part** [5] - 35:2, 35:22, 56:20, 58:18
**part-time** [1] - 56:20
**participate** [1] - 62:11
**participating** [1] - 3:9
**particular** [2] - 12:19, 15:2
**particularly** [3] - 50:25, 52:14, 55:7
**parties** [10] - 4:23, 5:10, 8:4, 8:12, 30:10, 36:1, 37:23, 38:3, 67:7, 67:8
**parties'** [3] - 5:1, 5:19
**partners** [1] - 47:23
**past** [1] - 37:6
**Patrice** [5] - 1:19, 1:23, 67:2, 67:11, 67:12
**pattern** [5] - 47:20, 49:12, 50:14, 50:18, 59:13
**patterns** [1] - 49:17
**pay** [6] - 19:18, 47:25, 63:11, 63:13, 64:2, 64:12
**payable** [2] - 63:16
**payment** [2] - 63:15, 64:5
**payments** [4] - 12:21, 12:23, 63:21, 63:23
**pays** [2] - 45:13, 57:2
**penalties** [2] - 3:21, 36:14
**penalty** [2] - 47:25, 48:6
**pending** [11] - 40:1, 40:13, 40:22, 40:23, 41:24, 42:11, 42:14, 47:17, 47:18, 57:11
**people** [16] - 13:4, 17:22, 19:16, 44:6, 48:11, 49:8, 55:2, 55:4, 55:5, 55:8, 57:8, 60:25, 61:2, 61:5, 61:13
**people's** [2] - 45:8, 55:6
**per** [1] - 63:25
**percent** [2] - 20:24, 63:23
**perhaps** [1] - 36:22
**period** [9] - 25:12, 38:12, 38:19, 39:7, 52:1, 53:1, 54:25, 58:19, 58:20
**periods** [3] - 23:22, 24:1
**permit** [3] - 33:19, 34:17, 34:19
**permitting** [1] - 34:1
**person** [6] - 33:23, 45:8, 45:10, 50:5, 50:12, 50:16
**person/property** [1] - 40:3
**personally** [2] - 3:7, 16:1
**pertain** [1] - 35:12
**pertinent** [1] - 57:19
**petition** [4] - 21:17, 25:25, 26:2, 26:9
**phone** [13] - 10:22, 16:22, 24:11, 24:22, 27:18, 35:4, 35:19, 37:7, 38:24, 40:4, 44:21, 47:22
**photo** [1] - 22:14
**photographs** [2] - 26:17, 26:21
**photos** [1] - 23:9
**physical** [2] - 47:22, 60:24
**physically** [2] - 37:8, 59:24
**pick** [1] - 44:21
**picture** [7] - 18:17, 18:20, 22:8, 22:10, 22:11, 22:13, 44:10
**place** [5] - 3:25, 33:16, 37:15, 67:3, 67:5
**placed** [4] - 47:13, 53:23, 62:8, 62:15
**placement** [1] - 52:21
**places** [2] - 32:1, 53:25
**plain** [1] - 15:5
**plain-clothes** [1] - 15:5
**Plaintiff** [1] - 1:4
**played** [1] - 20:20
**plea** [4] - 31:12, 65:23, 66:1, 66:3
**pled** [3] - 3:13, 3:15, 31:6

**point** [12] - 13:6, 13:25, 15:15, 18:6, 20:15, 24:7, 37:22, 40:25, 41:11, 42:2, 54:8, 58:21
**points** [3] - 31:23, 31:25, 32:1
**police** [11] - 9:18, 10:24, 11:2, 11:3, 11:4, 14:21, 16:17, 16:21, 16:24, 24:9, 46:13
**Police** [5] - 9:18, 9:23, 10:14, 11:5, 16:19
**poor** [1] - 42:9
**portion** [2] - 64:1, 64:9
**poses** [1] - 57:20
**position** [4] - 6:6, 31:10, 41:9, 42:1
**positive** [2] - 37:1, 37:17
**posses** [1] - 63:2
**possibility** [1] - 3:22
**possible** [5] - 28:15, 28:17, 38:15, 43:21, 51:14
**post** [1] - 37:4
**post-prison** [1] - 37:4
**potential** [1] - 53:2
**potentially** [1] - 33:21
**practice** [1] - 62:9
**practiced** [2] - 34:3, 34:4
**prescribed** [2] - 52:8, 53:3
**present** [4] - 3:8, 16:18, 16:20, 55:15
**presentations** [1] - 44:23
**presented** [1] - 28:25
**presentence** [11] - 3:11, 4:9, 6:24, 7:6, 30:6, 30:17, 40:12, 42:13, 45:21, 55:19, 63:9
**pressed** [1] - 39:16
**presumably** [1] - 35:20
**presume** [1] - 52:11
**previously** [2] - 39:17, 45:3
**prison** [3] - 3:22, 3:24, 37:4
**Prisons** [8] - 35:15, 35:18, 51:23, 61:17, 62:5, 62:12, 63:21
**privileged** [1] - 49:2
**PROBATION** [3] - 65:1, 65:7, 65:12
**Probation** [2] - 3:10, 64:3
**probation** [17] - 4:1, 4:2, 5:10, 30:21, 30:25, 31:7, 31:19, 36:16, 40:12, 42:10, 47:5, 47:10, 47:16, 57:11, 59:12, 63:4
**problem** [3] - 34:25, 35:3, 55:14
**problems** [4] - 18:3, 54:6, 55:15, 55:21
**proceed** [4] - 9:14, 12:10, 30:4, 41:17
**proceeding** [2] - 20:23, 21:1
**proceedings** [3] - 3:1, 67:4, 67:5
**Proceedings** [1] - 66:25
**Program** [2] - 62:13, 63:22
**program** [1] - 62:14
**prolonged** [3] - 38:12, 38:19, 58:20
**property** [1] - 33:17
**prosecution** [1] - 64:12
**protect** [4] - 43:12, 43:13, 58:9, 60:19
**protected** [1] - 35:25
**protection** [10] - 5:5, 18:6, 21:13, 33:25, 40:3, 42:15, 46:13, 47:6, 47:11, 47:13
**protective** [1] - 39:9
**proud** [1] - 37:12
**prove** [1] - 8:16
**proven** [2] - 40:24, 41:23
**provide** [8] - 15:15, 18:10, 18:13, 20:7, 25:4, 29:10, 33:16, 38:10
**provided** [5] - 15:17, 20:9, 29:9, 43:8, 51:23
**provides** [1] - 42:21
**provision** [1] - 58:8
**provisions** [1] - 8:10
**proximity** [1] - 62:5
**PSI** [5] - 7:1, 7:4, 7:10, 7:11, 49:20
**PSR** [4] - 7:13, 7:15, 7:18, 47:24
**psychological** [3] - 55:7, 57:17, 60:25
**PTSD** [1] - 24:23
**public** [4] - 31:3, 43:12, 43:13, 58:9
**punishable** [2] - 3:20, 3:21
**punished** [1] - 54:11
**punishment** [1] - 51:15
**purposes** [1] - 65:2
**pursuant** [1] - 64:4
**pursue** [1] - 64:4
**put** [2] - 12:7, 16:22
**Put** [1] - 46:8
**putting** [5] - 12:12, 18:13, 19:25, 20:12, 22:4

## Q

**quality** [2] - 49:10, 49:14
**Quantico** [1] - 10:3
**quarter** [1] - 63:25
**questions** [4] - 7:23, 7:25, 51:7, 66:16
**quiet** [1] - 37:18
**quite** [1] - 13:12

## R

**racing** [1] - 50:7
**range** [9] - 5:9, 5:24, 32:4, 32:8, 44:1, 44:4, 48:8, 48:16, 63:15
**rant** [1] - 44:17
**Rapids** [19] - 1:11, 1:18, 1:24, 9:18, 10:14, 11:5, 11:10, 12:14, 12:20, 14:5, 14:8, 14:20, 16:7, 16:19, 24:9, 35:11, 45:1, 66:6, 67:13
**rather** [4] - 6:11, 37:14, 51:20, 52:3
**rationale** [2] - 48:21, 48:22
**reach** [1] - 8:19
**reached** [5] - 4:23, 8:4, 8:12, 65:24
**reactive** [1] - 49:17
**read** [1] - 7:15
**real** [6] - 18:22, 51:24, 54:1, 57:20, 61:1
**really** [7] - 6:10, 45:12, 45:25, 48:9, 48:11, 54:3, 54:9
**realtor** [1] - 18:22
**Realtors** [1] - 18:22
**reason** [2] - 49:6, 50:13
**reasons** [2] - 52:16, 53:5
**receive** [6] - 19:9, 19:20, 21:2, 22:17, 31:11, 56:7
**received** [19] - 6:23, 10:13, 11:19, 11:20, 12:1, 12:2, 12:13, 12:15, 12:21, 14:5, 18:11, 19:6, 20:8, 20:10, 20:15, 22:18, 25:11, 28:5, 39:11
**receiving** [3] - 10:21, 12:24, 44:24
**recent** [1] - 43:3
**recently** [1] - 10:1
**recite** [1] - 5:19
**recommendations** [1] - 62:9
**recommended** [2] - 62:4, 62:11
**record** [6] - 6:21, 32:23, 43:4, 56:11, 65:9, 67:5
**recorded** [1] - 15:1
**recording** [1] - 20:20
**records** [13] - 16:5, 25:5, 28:17, 28:22, 29:6, 41:5, 43:1, 48:1, 48:3, 55:16, 55:23, 55:24, 56:21
**recounted** [1] - 12:25
**redirect** [1] - 29:18
**reduced** [3] - 42:21, 42:23, 58:4
**reduction** [2] - 31:8, 31:12
**refer** [1] - 23:16
**reference** [3] - 17:16, 17:19, 17:20
**referring** [2] - 13:7, 28:18
**reflect** [2] - 60:21, 61:6
**reflected** [2] - 40:22, 59:25
**reflects** [2] - 55:19, 59:16
**refuse** [1] - 51:4
**regard** [3] - 40:13, 40:20, 48:10
**regarding** [4] - 37:23, 58:13, 59:21, 60:8
**regards** [1] - 36:13
**regimen** [1] - 50:2
**rehabilitatable** [1] - 51:3
**rehabilitation** [1] - 52:12
**related** [3] - 29:6, 55:5, 67:6
**relations** [1] - 25:15
**relationship** [2] - 18:1, 23:9
**relative** [1] - 67:7
**release** [16] - 3:25, 5:25, 30:7, 32:12, 35:17, 37:4, 51:25, 52:1, 52:5, 52:19, 62:15, 62:16, 62:21, 62:23, 62:24, 64:2
**released** [3] - 36:16, 48:25, 53:24
**rely** [1] - 41:25
**remain** [3] - 15:9, 43:7, 64:10
**remains** [2] - 47:17, 64:16
**remanded** [1] - 64:14
**reoffend** [2] - 42:18, 59:12
**reoffending** [4] - 59:9, 59:10, 59:15, 59:18
**repeated** [1] - 61:1
**repeatedly** [2] - 45:16, 60:22
**report** [19] - 3:11, 4:9, 4:20, 6:22, 6:24, 7:7, 7:23, 8:1, 10:13, 11:4, 16:21, 30:6, 30:17, 35:20, 40:12, 42:13, 45:21, 55:19, 63:10
**reported** [3] - 1:18, 44:25, 67:3
**Reporter** [2] - 1:19, 67:2
**reports** [4] - 10:24, 41:5, 41:11, 55:23
**represent** [1] - 66:12
**represented** [2] - 3:6, 3:8
**reputation** [1] - 49:7
**request** [8] - 6:10, 10:13, 27:11, 33:19, 34:6, 44:1, 52:17, 53:5
**requested** [4] - 15:19, 52:21, 52:22, 60:16
**requirement** [2] - 33:15, 64:10
**requires** [1] - 58:3
**residence** [2] - 36:17, 64:8
**Residential** [1] - 62:12
**resides** [1] - 52:23
**resources** [1] - 63:25
**respect** [4] - 26:16, 46:5, 48:10, 59:14
**respective** [1] - 5:11
**respond** [1] - 45:2
**responding** [1] - 14:12
**response** [4] - 11:1, 14:4, 14:18, 40:10
**responsibility** [2] - 31:8, 31:17

**Responsibility** [1] - 63:22
**restitution** [1] - 36:25
**restraining** [3] - 16:12, 39:4, 46:8
**resulted** [5] - 31:2, 31:22, 35:4, 35:6, 57:10
**resulting** [1] - 41:20
**results** [1] - 56:17
**revealed** [1] - 26:13
**review** [5] - 4:8, 28:25, 29:6, 29:8, 29:13
**reviewed** [1] - 29:9
**revoked** [1] - 47:16
**revolved** [1] - 48:5
**Rick** [2] - 15:3, 27:4
**rights** [2] - 64:21, 65:20
**ripping** [1] - 50:10
**RMR** [2] - 1:23, 67:12
**Road** [2] - 1:13, 19:2
**roll** [1] - 45:1
**rotated** [1] - 15:11
**RPR** [2] - 1:23, 67:12
**run** [2] - 33:3, 61:19

## S

**S.E** [4] - 1:10, 1:17, 1:24, 67:13
**safe** [1] - 16:15
**safety** [2] - 46:13, 48:10
**sample** [1] - 63:3
**sat** [1] - 7:3
**satisfactory** [1] - 33:12
**satisfied** [1] - 12:23
**satisfy** [1] - 38:16
**saw** [1] - 39:13
**scared** [1] - 16:24
**schedule** [2] - 28:4, 64:5
**school** [3] - 54:2, 56:9
**score** [1] - 59:5
**scored** [2] - 5:10, 31:20
**scores** [1] - 58:17
**Scott** [1] - 11:3
**scratching** [1] - 57:15
**screen** [5] - 18:14, 19:25, 20:12, 21:16, 22:4
**screens** [1] - 12:12
**seal** [3] - 12:4, 12:7, 12:9
**sealed** [1] - 12:8
**seat** [1] - 9:10
**Seattle** [1] - 10:4
**second** [2] - 4:17, 38:22
**Section** [4] - 3:18, 54:18, 60:12, 62:3
**section** [6] - 30:19, 30:22, 31:1, 31:8, 31:13, 59:3
**Sections** [2] - 3:18, 54:17
**security** [4] - 15:20, 33:25, 45:16, 62:6
**Security** [1] - 56:22
**see** [10] - 7:13, 22:14, 22:15, 27:5, 27:7, 27:10, 27:20, 29:13, 43:4, 46:24
**seeing** [1] - 47:19
**seek** [2] - 21:13, 25:18
**seeking** [1] - 43:20
**seeks** [1] - 42:20
**seem** [1] - 20:21
**Seger** [5] - 15:3, 17:6, 27:4, 27:16, 27:23
**self** [1] - 35:6
**self-control** [1] - 35:6
**send** [2] - 21:21, 52:10
**sending** [3] - 18:4, 44:10, 45:4
**sends** [2] - 44:9, 46:10
**Senior** [3] - 18:5, 22:18, 51:11
**Senior's** [1] - 18:18
**sent** [4] - 6:25, 14:12, 39:14, 46:6
**sentence** [22] - 3:23, 3:24, 8:9, 31:24, 40:20, 43:25, 44:3, 48:13, 48:15, 52:17, 52:18, 53:6, 53:11, 54:14, 60:15, 60:18, 60:20, 61:6, 61:8, 65:20, 65:21, 66:9
**sentenced** [1] - 61:10
**sentencing** [11] - 3:5, 4:24, 7:10, 11:14, 11:22, 28:24, 29:11, 38:9, 51:15, 54:16, 60:18
**SENTENCING** [1] - 1:15
**series** [3] - 21:21, 55:1, 58:18
**serious** [7] - 43:9, 43:10, 55:15, 57:4, 58:10, 60:22, 61:13
**seriously** [1] - 61:5
**seriousness** [5] - 39:22, 59:8, 59:17, 60:21, 61:6
**serve** [2] - 26:4, 48:7
**served** [4] - 3:24, 26:3, 61:21, 62:18
**service** [4] - 13:16, 13:17, 26:6, 56:21
**services** [3] - 5:8, 31:4, 66:11
**set** [10] - 14:24, 16:7, 28:10, 30:5, 54:17, 60:11, 63:6, 63:8, 65:25, 67:9
**setting** [1] - 36:17
**seven** [5] - 14:12, 43:2, 44:25, 55:17, 56:12
**Seventh** [4] - 1:10, 1:17, 1:24, 67:13
**several** [3] - 15:21, 16:13, 39:5
**sexual** [1] - 9:25
**share** [1] - 7:1
**Shelley** [1] - 12:16
**shooting** [2] - 10:24, 17:20
**Shorthand** [2] - 1:19, 67:2
**shorthand** [2] - 1:20, 67:4
**shout** [1] - 44:17
**show** [3] - 43:11, 52:6, 52:8
**shown** [1] - 48:9
**shows** [2] - 49:3, 59:13
**sic** [2] - 32:5, 33:13
**sic]** [1] - 13:17
**significance** [1] - 45:12
**significant** [3] - 46:5, 49:15, 61:3
**significantly** [3] - 42:20, 42:22, 51:1
**similar** [5] - 41:19, 42:14, 42:16, 47:19, 47:21
**simply** [2] - 34:24, 41:11
**single** [1] - 30:16
**sirens** [2] - 14:15, 45:2
**sit** [1] - 36:9
**sits** [1] - 50:4
**sitting** [1] - 39:14
**six** [5] - 13:15, 14:21, 15:7, 53:24, 57:6
**skill** [2] - 36:23, 37:2
**sleep** [1] - 56:2
**slightly** [1] - 26:12
**Social** [1] - 56:22
**solution** [3] - 33:2, 33:6, 33:8
**someone** [2] - 17:4, 39:16
**sometime** [1] - 27:3
**sometimes** [2] - 13:10, 53:20
**somewhere** [1] - 37:14
**son** [5] - 18:1, 18:3, 18:11, 25:15
**son's** [1] - 22:22
**Sophie** [1] - 28:10
**sorry** [2] - 40:21, 60:24
**sought** [2] - 25:24, 39:10
**speaker** [1] - 16:22
**speaking** [1] - 19:12
**special** [8] - 4:5, 5:25, 14:24, 30:7, 32:6, 32:12, 63:7, 63:12
**specialist** [1] - 15:18
**specialized** [1] - 19:16
**specific** [2] - 48:7, 62:9
**specifically** [1] - 6:5
**specify** [1] - 65:3
**speed** [2] - 22:5, 45:17
**spend** [1] - 54:22
**spoken** [2] - 17:24, 19:3
**spontaneity** [1] - 35:3
**stand** [2] - 33:13, 52:13
**standard** [1] - 63:5
**start** [1] - 36:24
**started** [1] - 15:7
**starting** [1] - 14:22
**state** [9] - 9:11, 10:16, 11:7, 34:12, 41:5, 49:6, 49:15, 63:1
**State** [3] - 9:23, 17:7, 67:2
**statement** [4] - 16:23, 39:8, 41:6, 41:7
**statements** [15] - 11:9, 12:13, 12:25, 13:1, 13:4, 13:18, 16:11, 16:12, 16:17, 24:22, 25:19, 38:21, 38:25, 44:16, 46:11
**states** [1] - 47:24
**STATES** [2] - 1:1, 1:3
**States** [24] - 1:11, 1:23, 3:3, 3:5, 3:6, 3:10, 3:18, 4:7, 9:5, 31:14, 35:9, 35:12, 39:19, 41:19, 54:17, 60:12, 62:3, 63:11, 63:17, 64:3, 64:6, 64:15, 64:23, 67:12
**stationed** [1] - 15:9
**statutes** [1] - 62:21
**statutory** [1] - 3:20
**step** [1] - 29:20
**still** [4] - 17:10, 33:14, 63:20, 64:1
**stipulated** [1] - 32:17
**stop** [1] - 19:17
**stopped** [1] - 42:16
**stops** [1] - 50:16
**street** [1] - 50:14
**streets** [1] - 36:19
**stressed** [1] - 54:6
**stretched** [1] - 58:19
**structural** [1] - 14:8
**structure** [2] - 51:23, 51:25
**structured** [1] - 37:3
**struggle** [2] - 48:20, 49:5
**struggled** [1] - 49:3
**Stuber** [23] - 3:4, 7:13, 10:8, 17:24, 18:5, 18:6, 18:10, 18:18, 22:18, 24:7, 28:14, 30:12, 36:11, 37:21, 50:24, 51:5, 51:11, 52:6, 52:25, 53:8, 61:15, 65:19
**STUBER** [2] - 1:6, 36:10
**Stuber's** [2] - 23:3, 28:10
**submitted** [1] - 45:19
**subsection** [1] - 41:21
**subsequent** [1] - 12:6
**subsequently** [5] - 7:3, 11:4, 16:8, 26:5, 26:18
**substance** [4] - 19:12, 21:5, 62:13, 63:2
**substantial** [4] - 5:7, 8:7, 31:2, 48:12
**substantially** [5] - 38:11, 38:17, 39:22, 58:16, 59:7
**successful** [2] - 27:25, 28:2
**suffer** [1] - 49:21
**suffered** [1] - 25:2
**suffering** [3] - 42:22, 56:14, 58:4
**suffers** [1] - 56:3
**sufficient** [8] - 7:18, 32:23, 51:17, 54:15, 60:6, 60:19, 60:20, 61:8
**suggest** [3] - 56:13, 57:25,

59:11
**suggesting** [1] - 55:20
**suggests** [1] - 56:22
**Suite** [1] - 1:13
**summarized** [3] - 31:20, 54:23, 55:24
**superseding** [1] - 3:14
**supervised** [12] - 3:25, 5:25, 30:7, 32:12, 35:16, 52:1, 52:5, 52:19, 62:16, 62:21, 62:22, 62:24
**supervising** [2] - 33:9, 52:6
**supervision** [7] - 33:9, 42:9, 47:11, 51:22, 63:6, 63:8, 64:3
**support** [4] - 21:17, 39:9, 44:3, 46:19
**suppose** [1] - 41:14
**surmise** [1] - 20:25
**sustaining** [1] - 35:22
**Sweet** [1] - 12:16
**sweet** [1] - 15:20
**sworn** [1] - 9:8
**system** [6] - 49:7, 49:14, 49:24, 49:25, 52:13

## T

**table** [2] - 36:8, 36:9
**talk** [7] - 13:4, 13:6, 16:9, 30:7, 32:6, 32:12, 65:19
**talked** [3] - 7:22, 12:17, 16:10
**talking** [2] - 8:3, 45:8
**talks** [2] - 39:10, 44:8
**Task** [2] - 9:20, 10:2
**telephone** [5] - 3:9, 13:9, 13:13, 14:10, 33:23
**tell** [5] - 20:22, 24:24, 37:16, 38:4, 53:9
**telling** [1] - 45:16
**tells** [2] - 45:5, 46:9
**temper** [2] - 57:22, 57:24
**term** [19] - 3:25, 4:2, 34:13, 34:18, 51:20, 51:21, 52:4, 52:10, 52:18, 52:19, 61:17, 61:18, 61:20, 61:22, 62:16, 62:20, 62:22
**terms** [1] - 66:2
**Terrorism** [2] - 9:20, 10:2
**terrorism** [1] - 10:4
**terroristic** [3] - 39:17, 40:6, 47:15
**test** [2] - 51:24
**testified** [2] - 9:9, 49:16
**testimony** [2] - 26:24, 54:24
**text** [4] - 18:10, 19:20, 26:17, 34:15
**texting** [3] - 18:4, 47:7, 47:12
**texts** [1] - 47:14
**THE** [66] - 1:1, 1:1, 1:16, 3:2, 4:11, 4:25, 5:13, 5:18, 5:22, 6:14, 6:20, 7:12, 7:16, 7:17, 7:20, 7:21, 7:24, 7:25, 8:2, 8:3, 8:13, 8:14, 8:17, 8:18, 8:21, 8:22, 9:3, 9:10, 9:12, 9:13, 11:14, 11:19, 11:21, 12:1, 12:3, 12:9, 23:13, 29:18, 29:20, 29:25, 30:3, 31:16, 32:10, 33:1, 33:10, 34:23, 36:5, 37:21, 40:17, 41:22, 48:18, 53:7, 53:16, 54:13, 64:19, 64:25, 65:5, 65:8, 65:14, 65:18, 66:15, 66:16, 66:18, 66:19, 66:21, 66:23
**therapy** [1] - 51:10
**third** [1] - 31:15
**thoughts** [3] - 50:7, 50:8, 50:18
**threat** [5] - 5:4, 10:10, 43:9, 57:14, 58:10
**threaten** [2] - 21:24, 45:7
**threatened** [10] - 22:1, 22:2, 22:3, 39:5, 39:6, 44:17, 45:10, 45:12, 57:8
**threatening** [17] - 3:16, 10:22, 17:12, 18:5, 21:10, 21:22, 23:23, 24:2, 38:11, 38:18, 38:25, 39:3, 44:6, 44:9, 45:4, 47:14, 58:17
**threatens** [2] - 44:8, 61:12
**threats** [29] - 10:15, 10:21, 14:19, 14:23, 15:25, 22:22, 23:22, 25:11, 30:24, 32:20, 32:21, 35:1, 35:6, 39:17, 40:3, 40:6, 43:10, 45:14, 46:16, 47:15, 47:22, 48:5, 55:1, 55:10, 57:12, 57:19, 58:18, 61:1, 61:4
**three** [5] - 21:20, 31:24, 38:14, 38:16, 43:20
**throughout** [5] - 13:3, 22:21, 23:21, 46:4, 53:23
**throw** [1] - 48:23
**thrown** [1] - 48:25
**timely** [1] - 31:12
**TINDAL** [18] - 1:12, 5:17, 5:21, 6:4, 6:19, 6:23, 11:18, 12:6, 23:15, 29:16, 30:2, 32:7, 33:11, 40:7, 40:15, 48:20, 65:16, 66:20
**Tindal** [15] - 1:13, 2:4, 3:9, 5:15, 6:21, 7:12, 12:5, 29:25, 33:10, 34:23, 48:19, 53:7, 62:19, 65:15, 66:19
**Title** [4] - 3:18, 54:17, 60:12, 62:3
**today** [10] - 7:25, 8:4, 8:25, 33:13, 36:3, 37:10, 47:1, 50:4, 54:19, 66:17
**today's** [1] - 28:24
**together** [2] - 24:3, 30:15
**toll** [1] - 37:7
**took** [2] - 14:18, 15:3
**top** [3] - 44:1, 44:3, 48:16
**topic** [1] - 27:21
**tortured** [1] - 51:8
**total** [6] - 3:23, 4:4, 4:6, 31:18, 32:1, 32:3
**towards** [2] - 15:25, 25:15
**trade** [2] - 36:23, 37:2
**trained** [2] - 10:3, 10:5
**training** [5] - 9:21, 9:24, 10:2, 10:4, 10:5
**transcribed** [1] - 67:4
**Transcript** [2] - 1:21, 1:21
**transcript** [1] - 67:5
**transmitting** [1] - 3:16
**treatable** [1] - 51:3
**treatment** [10] - 36:22, 50:15, 51:10, 51:25, 52:24, 52:25, 53:23, 56:6, 60:2, 62:14
**Treatment** [1] - 62:13
**trespass** [2] - 40:6, 47:16
**trial** [1] - 5:15
**tried** [1] - 24:10
**trouble** [1] - 54:2
**troubling** [2] - 47:20, 57:5
**truck** [1] - 14:13
**true** [2] - 28:20, 67:5
**trust** [24] - 6:9, 12:21, 12:22, 15:4, 16:7, 17:3, 17:10, 28:4, 28:6, 28:8, 33:2, 33:6, 33:14, 33:20, 34:20, 34:24, 35:2, 35:12, 36:15, 45:13, 46:22, 48:1, 48:2, 57:2
**Trust** [7] - 11:10, 12:14, 12:20, 14:8, 16:8, 35:11
**trustee** [11] - 6:8, 6:9, 17:4, 26:25, 27:14, 33:5, 33:13, 34:7, 34:9, 34:19
**trusts** [1] - 34:4
**try** [1] - 25:1
**turmoil** [1] - 37:19
**turn** [1] - 37:16
**turned** [2] - 37:2, 37:13
**turning** [11] - 18:16, 18:24, 20:18, 30:14, 38:21, 46:18, 47:3, 47:6, 47:7, 54:21, 55:11
**twice** [1] - 7:8
**two** [12] - 3:14, 8:9, 20:6, 21:20, 27:15, 30:24, 38:11, 38:17, 38:18, 44:14, 56:1, 58:16
**type** [4] - 10:24, 40:18, 48:13, 61:11
**types** [1] - 12:18

## U

**U.S** [1] - 1:10
**ultimate** [1] - 30:11
**ultimately** [3] - 33:19, 38:4, 58:22
**unable** [1] - 50:8
**uncommon** [1] - 34:13
**under** [42] - 4:16, 5:1, 8:6, 8:9, 8:16, 12:4, 12:7, 12:9, 30:19, 30:22, 31:1, 31:8, 31:12, 31:24, 34:21, 39:19, 40:20, 40:22, 41:20, 42:7, 42:8, 42:20, 43:15, 43:21, 44:2, 48:3, 58:2, 58:7, 58:15, 58:25, 59:3, 59:4, 59:12, 59:19, 60:9, 62:3, 65:11, 65:25, 66:1, 66:2
**underrepresented** [1] - 39:20
**underrepresents** [1] - 39:22
**understate** [1] - 59:9
**understatement** [1] - 59:4
**understates** [1] - 59:7
**unemployment** [1] - 56:25
**unfortunately** [1] - 49:13
**UNITED** [2] - 1:1, 1:3
**United** [24] - 1:11, 1:23, 3:3, 3:5, 3:6, 3:10, 3:18, 4:7, 9:5, 31:14, 35:9, 35:11, 39:19, 41:19, 54:17, 60:12, 62:3, 63:11, 63:17, 64:3, 64:6, 64:14, 64:22, 67:12
**units** [2] - 14:13, 44:25
**universe** [1] - 50:20
**unlawfully** [1] - 63:2
**unlike** [2] - 50:19, 51:4
**unpaid** [1] - 64:10
**unproven** [2] - 41:11, 41:16
**unproven/unconvicted** [1] - 40:9
**unreasonable** [1] - 34:21
**unrehabilitatable** [1] - 48:23
**unsuccessful** [1] - 17:9
**unverified** [1] - 56:18
**up** [36] - 3:22, 3:25, 4:3, 6:14, 8:16, 14:11, 14:20, 14:24, 16:7, 17:13, 22:5, 25:18, 27:21, 27:22, 28:10, 35:18, 36:7, 36:17, 37:10, 38:3, 43:24, 44:15, 44:21, 45:18, 45:20, 48:23, 49:13, 50:17, 50:23, 51:4, 51:7, 51:14, 56:24, 65:6, 66:9
**upset** [1] - 44:24
**upward** [24] - 37:24, 37:25, 38:8, 38:10, 39:21, 40:20, 42:7, 43:17, 43:18, 46:17, 46:19, 48:14, 58:13, 58:14, 59:2, 59:4, 59:19, 60:8, 60:9, 60:13, 65:4, 65:9, 65:10
**upwards** [1] - 42:18
**use** [2] - 46:12, 63:2
**used** [1] - 44:19
**uses** [1] - 45:8
**using** [3] - 1:19, 13:14, 60:23
**utilized** [1] - 53:1

## V

**Valladares** [13] - 20:2, 20:4, 21:3, 21:11, 22:2, 25:24, 26:10, 32:18, 32:20, 39:7, 39:9, 46:7, 47:8
**Valladares's** [1] - 47:12
**VanderMolen** [2] - 3:10, 64:25
**variance** [10] - 38:1, 38:2, 43:17, 46:19, 59:21, 59:22, 60:7, 60:13, 65:4
**variances** [4] - 5:12, 30:11, 37:24, 43:15
**vary** [5] - 43:17, 46:16, 60:9, 65:8, 65:10
**varying** [1] - 51:18
**verbally** [1] - 59:24
**versus** [1] - 3:3
**victim** [7] - 15:16, 15:18, 36:5, 38:12, 38:13, 44:22, 58:23
**victims** [12] - 6:3, 30:8, 32:18, 36:2, 38:14, 38:19, 46:12, 47:9, 55:10, 58:21, 58:24
**video** [7] - 20:10, 20:16, 20:18, 20:21, 20:22, 39:14, 46:10
**violated** [5] - 47:5, 47:6, 47:10, 47:11, 57:7
**violates** [1] - 59:12
**violating** [1] - 4:17
**violation** [5] - 3:17, 5:5, 40:2, 40:5, 47:17
**violations** [1] - 42:10
**violence** [4] - 40:5, 43:9, 43:11, 58:10
**Virginia** [1] - 10:3
**visited** [1] - 61:14
**vocational** [1] - 46:25
**voice** [1] - 14:9
**voicemail** [3] - 13:11, 15:2, 19:9
**VS** [1] - 1:5

## W

**waived** [2] - 64:11, 65:24
**want** [7] - 16:9, 37:5, 37:11, 44:12, 45:9, 62:8, 65:3
**wanted** [3] - 17:7, 19:16, 44:18
**wanting** [1] - 12:22
**wants** [4] - 44:7, 45:6, 53:4
**warrant** [1] - 51:18
**warrants** [6] - 16:14, 17:1, 42:15, 46:9, 46:14
**web** [1] - 44:11
**website** [1] - 18:21
**weeks** [2] - 14:21, 15:7
**weight** [4] - 41:1, 41:15, 42:1, 42:4
**well-being** [1] - 48:11
**WHEREOF** [1] - 67:9
**willful** [1] - 39:25
**William** [3] - 3:3, 10:8, 17:24
**WILLIAMS** [1] - 1:16
**Williams** [1] - 67:3
**willing** [1] - 4:25
**windshield** [1] - 47:14
**wish** [3] - 29:25, 30:8, 36:3
**wishes** [2] - 29:23, 30:12
**withdraw** [2] - 5:2, 5:6
**witness** [5] - 9:1, 9:4, 9:8, 11:9, 12:13
**WITNESS** [2] - 9:12, 67:9
**witnesses** [5] - 8:24, 8:25, 12:25, 29:22, 30:1
**Wolf** [1] - 13:7
**words** [2] - 22:4, 60:23
**work** [9] - 9:17, 14:21, 33:8, 36:17, 36:18, 46:20, 49:7, 56:16, 56:17
**worked** [3] - 15:12, 56:19, 56:20
**working** [1] - 57:1
**world** [2] - 34:4, 50:23
**worse** [1] - 54:5
**written** [3] - 33:22, 66:5, 66:8

## Y

**years** [21] - 3:22, 4:1, 4:2, 18:3, 34:4, 37:19, 39:4, 39:7, 39:12, 42:12, 43:2, 43:3, 45:5, 55:18, 56:12, 56:24, 62:16, 62:17, 62:22
**years'** [1] - 3:23
**young** [1] - 25:15